744 A.2d 1169

THE STOP & SHOP SUPERMARKET COMPANY, A CORPORATION OF THE STATE OF DELAWARE AND STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSO-CIATION, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE UNDER A TRUST AGREEMENT DATED AS OF APRIL 26, 1994, PLAINTIFFS–APPELLANTS, v. THE BOARD OF ADJUSTMENT OF THE TOWNSHIP OF SPRINGFIELD, COLONIAL ASSOCIATION OF SPRINGFIELD AND THE TOWNSHIP OF MILLBURN, DEFENDANTS–RESPONDENTS, AND VILLAGE SUPER MARKET, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND SUMAS REALTY CORPO-RATION, A CORPORATION OF THE STATE OF NEW JERSEY, INTERVENORS–RESPONDENTS.

Argued November 8, 1999—Decided February 9, 2000.

420

*James V. Segreto,* argued the cause for appellants (*Segreto & Segreto,* attorneys; *Mr. Segreto* and *Paul A. Segreto,* on the brief).

*Roger S. Clapp,* argued the cause for respondent The Township of Millburn (*Cooper, Rose & English,* attorneys; *Mr. Clapp* and *Bruce S. Goodman,* on the brief).

*Stephen E. Barcan,* argued the cause for intervenors-respondents, Village Super Market, Inc. and Sumas Realty Corporation

(*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Barcan* and *Donna M. Jennings,* on the briefs).

*Neil J. Dworkin,* argued the cause for respondent The Board of Adjustment of the Township of Springfield.

*Michael S. Feldman,* argued the cause for respondent Colonial Association of Springfield (*Wasser & Feldman,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

The principal issue presented by this appeal concerns the extent to which a previously granted use variance to an applicant conducting a retail business use binds the municipality to permit the applicant's transferee, engaged in a different retail business use, to succeed to the rights conferred by the use variance. Stating the question more narrowly, where the prior use variance allowed a retail department store, a permitted use, to use the residentially-zoned portion of its split-zoned lot for parking as a use accessory to the permitted retail use, is the benefit of that use variance for parking available to a retail supermarket, the department store's transferee, whose proposed use also constituted a permitted retail use under the ordinance?

In a published opinion, the Appellate Division, reversing the judgment of the Law Division holding that the retail supermarket succeeded to the rights conferred by the earlier use variance, determined that the differences between the two enterprises precluded reliance on the earlier variance. *Stop & Shop v. Board of Adj. of Springfield,* 315 *N.J.Super.* 427, 436–37, 718 *A.*2d 1218 (1998). That court observed that "[i]n granting these variances, the Board considered only the specific enterprise proposed by Sak's in its application. . . . [A]ny proposed, significant change or alteration in the use of the property required further consideration by the board of adjustment." *Id.* at 435, 718 *A.*2d 1218.

We granted Stop & Shop's petition for certification, 158 *N.J.* 687, 731 *A.*2d 47 (1999), and now reverse the judgment of the Appellate Division.

I

The relevant facts essentially are undisputed. Stop & Shop (S & S) instituted this suit to challenge the determination of the Springfield Board of Adjustment (Board or Board of Adjustment) that S & S, which seeks to open and operate a retail supermarket on property previously owned by Saks Fifth Avenue (Saks) and occupied since 1956 by Saks' retail department store, cannot rely on use variances granted by the Board in 1956 to permit parking on the residentially-zoned portion of the lot, and in 1968 to permit construction of an addition to the store on that same part of the lot.

The property in controversy consists of approximately 9.7 acres with about six-hundred feet of frontage on Millburn Avenue, a heavily-traveled county road occupied in the vicinity of the property by a variety of retail commercial uses. Although the portion of the property located within twenty feet of Millburn Avenue is located in Millburn Township, the bulk of the property is located in Springfield. During all relevant periods (other than the period subsequent to April 1999, when a new zoning ordinance took effect, *infra* at 428–30, 744 *A.*2d at 1175), the Springfield portion of the property was split-zoned in approximately equal parcels, the portion closest to Millburn Avenue to a depth of about two-hundred feet being commercially zoned and the southerly portion being residentially zoned. When Saks obtained its variance in 1956, the commercially zoned portion was in the General Business (GB) District in which a "Retail store or group thereof" was a permitted use. In 1956 the residentially zoned portion, having an average depth of 120 feet, was zoned S–120, a single-family residence zoning district requiring 120 feet of frontage, and front and rear yard setbacks of fifty feet and seventy-five feet respectively.

In 1994 when S & S applied for a certificate of occupancy, the commercially-zoned portion of the property was zoned General Commercial (GC), in which "Retail Sales and service stores" were a permitted use. The ordinance defined "Retail Sales and Services" as follows:

The sale of goods for use or consumption off the premises, which goods are intended to meet direct consumer food, clothing, furnishing, recreational or other needs and are not intended for resale, and/or the sale of services such as personal care, financial, repair, catering and other similar services. The term "retail sales and service" shall specifically exclude the sale of any type of motor vehicle, as defined by *N.J.S.A.* 39:1–1.

That supermarkets are a permitted use in the GC zone under the ordinance in effect prior to 1999 is not disputed, and off-street parking is a permitted accessory use in that zone. At some time subsequent to 1956 the residentially-zoned portion of the property was rezoned from S–120 to S–75.

The property was occupied by Saks' retail department store from approximately 1957 to 1994. Until 1968 the department store was a 64,000 square-foot structure located entirely within the commercial zone, and the accessory parking was located partly in the commercial zone and, pursuant to the 1956 use variance, partly in the S–120 residential zone. Pursuant to a second use variance granted in 1968, Saks was permitted to construct a 19,000 square foot addition to its building, of which 13,000 square feet were located in the residentially-zoned portion of the property.

The residentially-zoned portion of the property is abutted on its southerly and south-easterly boundaries by older residential dwellings located in the S–60 residential zone requiring sixty feet of frontage and an area of 7500 square feet. Those dwellings front on Baltusrol Avenue and Short Hills Avenue, local streets running nearly parallel with Millburn Avenue, and on Tower Drive, a local street perpendicular to Millburn Avenue but bounded by Baltusrol Avenue to the north and Short Hills Avenue to the south.

In 1956 Saks applied to the Board of Adjustment for a use variance to permit the residentially-zoned portion of the property to be used for vehicular parking that was accessory to the Saks

department store proposed to be constructed on the commercially-zoned portion of the property. The proposed parking area would accommodate 750 cars. The application initially was considered by the Board at its regular meeting on January 26, 1956. (The record before us includes the minutes of the pertinent meetings of the Board, as well as the Board's resolution, but does not include a transcript of the hearings conducted by the Board.) At the initial Board meeting the concerns of residents near the property focused on the lack of complete building and site plans for the proposed project, and on whether Baltusrol Avenue, a dedicated public street with an unpaved segment that extended onto the Saks property, would be vacated and dead-ended outside the property's boundary or, alternatively, paved to provide ingress to and egress from the proposed parking area. Most residents favored vacating the unpaved portion of Baltusrol Avenue to prevent traffic generated by the department store from creating a burden on local streets.

The Board's formal action on the application was deferred until its March 22, 1956 meeting to permit a site inspection. At that meeting the Board unanimously approved the Saks use variance. The Board's resolution included findings by the Board that the residentially-zoned portion of the Saks property was unsuitable for residential development. Specifically, the Board noted that because the depth of the property's residential portion was approximately 120 feet and the S–120 residential zone required front and rear yard setbacks of fifty and seventy-five feet respectively, the residential portion of the property was "incompatible with the depth requirements for the zone." In addition to the insufficiency of its depth, the Board concluded that "the residence zoned portion of the subject premises [does] not lend [itself to] the construction of houses" because "it would abut immediately on a business zone," the construction of homes contemplated by the S–120 zone is "incompatible with the established patterns of homes in the [abutting] residential area," and, finally, because residential development would require paving and extension of Baltusrol Avenue resulting in the use of that street by "large scale commer-

cial and other vehicular traffic," that development would be incompatible with residential uses in the area. The Board concluded that the property's "highest and best use" would be achieved by the grant of the use variance and the "integrated development" of the entire parcel for the proposed retail commercial purpose because it would "promote the general welfare" and "preserve and enhance property values" by removing the danger of residential development that is "haphazard and inconsistent" with the surrounding area. The grant of the variance was conditioned on the closing of Baltusrol Avenue at the property line, construction of a ten-foot buffer strip along the rear of lots fronting on Tower Drive, and construction of a six-foot fence around that portion of the property's perimeter that abuts residential development.

In 1968 Saks applied for and was granted a second variance to extend its department store building, formerly confined entirely to the GC zone, into the S–120 residential zone. The Board's resolution determined that "since the store is located where it is, the area into which applicant seeks to extend the store is no longer suited for residential use." In addition, the Board found that "[t]he Saks Fifth Avenue store provides shopping of a quality not otherwise available in the community, and ... from the evidence adduced that to maintain such quality standards the requested expansion is necessary." The 1968 variance contained additional conditions regarding adjacent roadways, parking, plantings and shrubs, buffer strips, lighting and fencing. As was the case with the original resolution, however, no conditions were imposed limiting or defining the scope of the retail use permitted under the variance. Saks' 1968 variance application stated that an addition of 30,400 square feet was proposed, and that the existing building occupied approximately 64,000 square feet. Although the Board approved the entire addition sought by Saks, the record reveals that the size of the expanded building aggregates 83,000 square feet, of which approximately 13,000 square feet is in the residentially-zoned portion of the property. That suggests that the addition constructed by Saks pursuant to the 1968 variance was

about 19,000 square feet, of which 6000 square feet was in the commercially-zoned part of the property.

In May 1994 counsel to S & S wrote a letter to the Springfield Zoning Officer seeking a determination that S & S would be permitted to use the Saks property for a retail supermarket. S & S proposed two alternative plans. One proposal contemplated the use of the existing 83,000 square foot existing structure, with some modifications that would not increase the existing square footage. The second proposal contemplated a new structure consisting of approximately 85,000 square feet, of which approximately 4400 square feet would be located in the residentially-zoned portion of the property. The letter noted that a retail supermarket is a permitted use in the GC zone, and requested the zoning officer's confirmation that S & S would not require any variances if it proceeded under either of the proposed alternatives. Counsel to the Board of Adjustment replied to S & S's letter on behalf of the Zoning Officer. That response informed S & S that it could not rely on the prior Saks variances, and that S & S either should seek a new variance, rezoning of the property, or review of the Zoning Officer's determination from the Board of Adjustment. S & S appealed to the Board from the Zoning Officer's determination pursuant to N.J.S.A. 40:55D–70(a) and (b), contending that it was entitled to rely on the use variances previously granted to Saks. The Board conducted hearings on S & S's appeal in February and April 1996.

At the hearings S & S produced Ken Narva, an architect, who testified concerning the layout of the existing structure and the shape and size of the proposed new structure S & S would construct under its alternative plan. That new structure would have a "footprint" of approximately 73,200 square feet and would include two storage mezzanines totaling about 12,000 additional square feet. Approximately 4400 square feet would be located in the residentially-zoned portion of the property, substantially less than the Saks building that included over 13,000 square feet in the residential zone. The proposed building would include seven fully

enclosed loading docks, compared with one open loading dock at the existing building. The proposed S & S plan contemplates 493 parking spaces, compared to 547 parking spaces on the existing building site.

Cynthia Fuller, a twenty-nine-year resident of Millburn and a frequent patron of Saks as well as area supermarkets, testified as a joint witness for several objectors. She testified that the merchandise sold by Saks was "very upscale. Mainly women's clothing, and in my opinion, very expensive." She testified that Saks also sold cosmetics, and operated a restaurant as well as a beauty parlor. She recalled that the Saks store was open on Monday and Thursday evenings and, in recent years, on Sunday afternoons. She described the store's atmosphere as "dignified," characterizing it as "[n]o hustle-bustle or that type of thing." She testified that the Saks parking lot never was completely filled and that, typically, she could find a parking space very near to the store's entrance. She testified that traffic conditions on Millburn Avenue were especially heavy during rush hour and on Saturdays.

At the conclusion of the hearings the Board voted six to one to sustain the zoning officer's conclusion that S & S required a new use variance to operate its supermarket on the Saks property. The Board's resolution noted that S & S declined "to offer proofs concerning a qualitative comparison between the previously approved use of the residentially-zoned property and the newly proposed use of the residentially-zoned property." The Board concluded that S & S failed to demonstrate "that the supermarket business it intends to operate on the property . . . is of a similar nature, kind, or use intensity to that of the Saks operation and thus cannot be included or permitted under the variances previously granted for Saks Fifth Avenue."

S & S filed a complaint in lieu of prerogative writ challenging the Board's decision. The Colonial Association of Springfield, comprised of Springfield residents potentially affected by the proposed use, and the Township of Millburn were permitted to intervene as defendants. In an unpublished opinion the trial court

reversed the Board's determination as an abuse of discretion, ruling that S & S did not need a new use variance to operate a supermarket on the property.

The court determined that whether S & S's use of the property was qualitatively similar to Saks' use was irrelevant because the specific concerns cited by the board—S & S's longer hours of operation, greater number of loading docks, and greater number of customers—were ordinarily addressed in the site plan review process. The court noted that from a land-use perspective, the Springfield zoning ordinance does not distinguish between types of "retail and service stores," the category under which both supermarkets and department stores fall. Therefore, the court observed, the same zoning requirements apply to both types of use. The court also noted that variances are not personal to the owner, but run with the land.

The Springfield Board of Adjustment, the Township of Millburn, and the Colonial Association of Springfield appealed the judgment of the Law Division. Prior to argument, the Appellate Division permitted Village Super Market, Inc. and Sumas Realty Corporation to intervene in the action. The Appellate Division reversed the trial court's judgment, observing that "a use created by a variance may not be expanded or substantially changed without further application to the board of adjustment." 315 *N.J.Super.* at 431, 718 *A.*2d 1218. The court concluded that "[i]n granting these variances, the Board considered only the specific enterprise proposed by Sak's in its application." *Id.* at 435, 718 A.2d 1218. "[A]ny proposed, significant change or alteration in the use of the property required further consideration by the board of adjustment." *Ibid.*

As noted, in April 1999, subsequent to the judgment of the Appellate Division and prior to argument before this Court, Springfield enacted an amendment to its zoning ordinance establishing an Affordable Housing Mixed Use (AH–MU) zone, the boundaries of which are identical to the boundaries of S & S's property. No other property in Springfield is located in the AH–

MU zone. Permitted uses in the AH–MU zone include senior citizen housing, with twenty percent of the units reserved for low- and moderate-income senior citizens. Also permitted are commercial uses allowed in the Neighborhood Commercial zone, but no commercial establishment can exceed 7000 square feet in gross floor area. Moreover, not more than thirty percent of any property in the AH–MU zone shall be used for commercial purposes, and no commercial use or parking accessory to a commercial use shall be further than two-hundred feet from Millburn Avenue. S & S has challenged the validity of that ordinance in a separate suit now pending in the Law Division, alleging in part that the amendatory ordinance constituted "spot-zoning," and that its proposed use of the property unlawfully would be prohibited by the terms of the amendatory ordinance. Concurrently with the filing of this opinion, we grant the motion of Intervenor Village Super Market, Inc. to supplement the record with the provisions of the amendatory ordinance.

## II

A brief review of certain basic principles of zoning law may illuminate our analysis of the issues implicated by this appeal. New Jersey's first zoning statute was enacted in 1924, *L.* 1924, *c.* 146, and was modeled after the standard state zoning statute drafted by the United States Department of Commerce. Our 1924 statute authorized local boards of adjustment to grant variances "not [ ] contrary to the public interest," to avoid "unnecessary hardship, and so that the spirit of the ordinance shall be observed and substantial justice done." *L.* 1924, *c.* 146, § 7(3). See *Commercial Realty and Resources Corp. v. First Atlantic Properties Co.,* 122 *N.J.* 546, 553–54, 585 *A.2d* 928 (1991). In the early stages of zoning legislation, courts expressed the concern that without a procedure permitting the grant of variances, zoning ordinances could be vulnerable to constitutional challenge. In *Brandon v. Board of Com'rs of Montclair,* 124 *N.J.L.* 135, 142–43,

11 *A*.2d 304 (Sup.Ct.), *aff'd*, 125 *N.J.L.* 367, 15 *A*.2d 598 (E. & A.1940), the court observed:

> Due to the necessity of generality in the subdivision of the municipality into districts under the zoning power, especial hardship ofttimes ensues unnecessarily and unreasonably to individual landowners; and the function of the board of adjustment under the statute is, through a variance, to relieve from such consequences, and thus to avert what would otherwise take the category of an unwarranted interference with the right of private property. Such use restrictions are not reasonable unless fairly necessary for the attainment of one or more of the intents set forth in section 40:55–32, *supra;* and, while the general regulation may be reasonable, its application in the individual case, by reason of special conditions, may constitute an unnecessary and unjust invasion of the right of property. In such circumstances, the board of adjustment is invested with power to vary the application of the general regulation to serve the statutory policy.
>
> [ (citation omitted).]

*See also Somers v. Bradley Beach,* 115 *N.J.L.* 135, 138–40, 178 *A.* 755 (E. & A.1935) (describing variance power of board of adjustment as "an essential adjunct to a zoning ordinance," and invalidating local zoning ordinance because of omission of authorization for special exception and variance appeals to board of adjustment); *accord,* Note, *Zoning Variances,* 74 *Harv. L.Rev.* 1396 (1961) (observing that variance power originally was considered necessary to protect zoning ordinances from constitutional objection).

Our caselaw firmly establishes the nature of the proofs necessary to constitute "special reasons," the statutory standard that authorizes the grant of use variances. *N.J.S.A.* 40:55–70d. In one narrow class of cases, those involving inherently beneficial uses, the proofs supporting special reasons focus less on the characteristics of the specific property and to a greater extent on whether the proposed use furthers the general welfare because the institutional character of the use fulfills a necessary or significant public purpose. *See Medici v. BPR Co.,* 107 *N.J.* 1, 11–12, 526 *A*.2d 109 (1987). Nevertheless, the proponent of an inherently beneficial use variance also must address the statutory negative criteria and prove that on balance the public benefit outweighs any impairment to the zone plan and zoning ordinance or any detriment to the neighborhood. *Sica v. Board of Adj. of Wall,* 127 *N.J.* 152, 165–66, 603 *A*.2d 30 (1992). Accordingly, if the proofs demon-

strate that because of the specific property's location and characteristics the detrimental effects of an inherently beneficial use outweigh the public benefit, a municipality is authorized to deny the requested variance. *Id.* at 166, 603 *A.*2d 30.

By far the more common category of use variance applications concerns commercial uses that are not inherently beneficial. For such variance applications, the required proof of special reasons focuses exclusively on the special characteristics of the property and imposes on the applicant the burden of establishing either "that the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought," *Kohl v. Mayor of Fair Lawn,* 50 *N.J.* 268, 279, 234 *A.*2d 385 (1967), or that undue hardship exists because the property for which the use variance is sought cannot reasonably be adapted to a conforming use. *Medici, supra,* 107 *N.J.* at 17 n. 9, 526 *A.*2d 109. We note that the 1956 resolution of the Springfield Board of Adjustment granting the original Saks variance relied on both of those permissible grounds for a commercial use variance, determining that the residential portion of the Saks property was best suited for "integrated" development with the commercial portion for use as a retail department store, and that exceptional and undue hardship existed because of that property's unsuitability for residential use.

Similarly, our cases make clear that in respect of appeals for bulk or dimensional variances based on undue hardship pursuant to *N.J.S.A.* 40:55–39c(1), "personal hardship is irrelevant to the statutory standard, and ... the correct focus must be on whether the strict enforcement of the ordinance would cause undue hardship because of the unique or exceptional conditions of the specific property." *Lang v. Board of Adj. of North Caldwell,* 160 *N.J.* 41, 53, 733 *A.*2d 464 (1999).

The constitutional concerns that prompted the inclusion of a variance appeal procedure in the early versions of zoning ordinances, combined with the property-specific focus of the proofs that ordinarily must be elicited to support commercial use vari-

ances, provide the rationale for the widely accepted principle of zoning law that "a variance granted becomes attached to the land and is not a mere personal right, and a purchaser takes the land free from those zoning restrictions to which the variance pertains." Eugene McQuillin, *The Law of Municipal Corporations,* § 25.163 (3d ed.1991). In *Industrial Lessors, Inc. v. City of Garfield,* 119 *N.J.Super.* 181, 290 *A.*2d 737, *certif. denied,* 61 *N.J.* 160, 293 *A.*2d 390 (1972), the Appellate Division expressly recognized that characteristic of variances:

> A variance, however, is an official *quasi*-legislative, *quasi*-judicial determination that the use or structure allowed is not offensive to the ordinance in the broad context of the particular circumstances which, under the statutory criteria specified by *N.J.S.A.* 40:55–39, have authorized the grant. In essence, the use or structure allowed becomes a conforming use. 2 *Rathkopf, The Law of Planning and Zoning* (3d ed. 1972), 46–1. Although a variance can perhaps be lost by abandonment, see *North Plainfield v. Perone,* 54 *N.J.Super.* 1, 12–13, 148 *A.*2d 50 (App.Div.) *certif. den.* 29 *N.J.* 507, 150 *A.*2d 292 (1959) it otherwise partakes to a large degree of the characteristics of a vested right running with the land. 2 Rathkopf, *op. cit.*
> [*Id.* at 183, 290 *A.*2d 737.]

Other New Jersey cases have emphasized that use variances adhere to the property and are not personal to the applicant. *See, e.g., Soho Park Land Co. v. Board of Adj. of Belleville,* 6 *N.J.Misc.* 686, 687, 142 *A.* 548 (Sup.Ct.1928) (invalidating condition attached to use variance allowing construction of industrial building in residential zone that limited building to use "solely as a wire factory" by applicant for variance, noting that condition constituted "restraint on alienation" that would affect value of property); *Aldrich v. Schwartz,* 258 *N.J.Super.* 300, 308, 609 *A.*2d 507 (App.Div.1992) (noting that "[v]ariances run with the land and are not personal to the property owner who obtained the grant"); *Berninger v. Board of Adj. of Midland Park,* 254 *N.J.Super.* 401, 405, 603 *A.*2d 954 (App.Div.1991), *aff'd* 127 *N.J.* 226, 603 *A.*2d 946 (1992) (noting that "a condition [that] limits the life of a variance to ownership by a particular individual is patently illegal, as it advances no legitimate land use purpose"); *DeFelice v. Zoning Bd. of Adj. of Point Pleasant Beach,* 216 *N.J.Super.* 377, 383, 523 *A.*2d 1086 (App.Div.1987) (holding that "a variance runs with the land and is not personal to the property owner"); *Farrell v. Estell*

*Manor Zoning Bd. of Adj.*, 193 *N.J.Super.* 554, 558, 475 *A.*2d 94 (Law Div.1984) (stating that "[a] variance granted is not personal to the owner to whom granted but is available to the grantee's successors").

■ The caselaw throughout the country, consistent with our decisions, recognizes that variances run with the land and that their benefit is available to the applicant's successors in title. *See Garibaldi v. Zoning Bd. of Appeals of Norwalk*, 163 *Conn.* 235, 303 *A.*2d 743, 745 (1972); *National Black Child Development Institute, Inc. v. District of Columbia Bd. of Zoning Adj.*, 483 *A.*2d 687, 691–92 (D.C.App.1984); *Halifax Area Council on Alcoholism v. City of Daytona Beach*, 385 *So.*2d 184, 188 n. 5 (Fla.App. 1980); *Huntington v. Zoning Bd. of Appeals of Hadley*, 12 *Mass.App.Ct.* 710, 428 *N.E.*2d 826, 829–30 (1981); *State v. Konopka*, 119 *Ohio App.* 513, 200 *N.E.*2d 695, 696 (1963); *Vlahos Realty Co. v. Little Boar's Head*, 101 *N.H.* 460, 146 *A.*2d 257, 260 (1958); *Mechem v. City of Santa Fe*, 96 *N.M.* 668, 634 *P.*2d 690, 694 (1981); *St. Onge v. Donovan*, 71 *N.Y.*2d 507, 527 *N.Y.S.*2d 721, 522 *N.E.*2d 1019, 1022–23 (1988); *Neiburger v. Lewis*, 185 *Misc.* 437, 57 *N.Y.S.*2d 542, 544–45 (*N.Y.Sup.* 1945); *Mastrati v. Strauss*, 75 *R.I.* 417, 67 *A.*2d 29, 30–31 (1949); *Nuckles v. Allen*, 250 *S.C.* 123, 156 *S.E.*2d 633, 637–38 (1967); *Goldberg v. City of Milwaukee Bd. of Zoning Appeals*, 115 *Wis.*2d 517, 340 *N.W.*2d 558, 561–62 (Wis.App.1983). *Accord*, Robert M. Anderson, *American Law of Zoning*, § 14.29 (1968); Rathkopf, *The Law of Zoning and Planning*, § 38.07 (4th ed.1994); Rohan, *Zoning and Land Use Control*, § 43.03 (1984); Yokley, *Zoning Law and Practice*, § 21–2 (4th ed.1979); Phillip P. Green Jr., *The Power of The Zoning Board of Adjustment to Grant Variances From the Zoning Ordinance*, 29 *N.C. L.Rev.* 245, 278 (1951); Note, *Zoning Variances, supra*, 74 *Harv. L.Rev.* at 1398.

Perhaps the clearest explanation of the principle that the specific representations and circumstances of the successful applicant for a use variance cannot be permitted to limit the availability of the variance to successors in title is found in an opinion by the

New York Court of Appeals in *Dexter v. Town Board of Gates,* 36 *N.Y.*2d 102, 365 *N.Y.S.*2d 506, 324 *N.E.*2d 870 (1975). In *Dexter,* the applicant successfully sought rezoning of a twelve-acre residentially-zoned tract of land to permit its development as a retail shopping center. In rezoning the property, the Town Board imposed as a condition that the rezoning would inure only to the benefit of the applicant and only for the specific use contemplated by the application. In invalidating that condition, the New York Court of Appeals distinguished between the representations made to encourage rezoning or variance grants and the proper scope of the action taken by the municipal agency:

> While it is a fundamental principle of zoning that a zoning board is charged with the regulation of land use and not with the person who owns or occupies it, we recognize that customarily, as is here illustrated, when a change of zone, a variance or a special permit is sought, there is a specific project sponsored by a particular developer which is the subject of the application. As a practical matter, the application is usually predicated on a particular type structure, often accompanied by architectural renderings, for a particular use by a specific intended user. In the usual case, the application and accompanying graphic material come to constitute a series of representations frequently bolstered at the hearing by additional promises or assurances made to meet objections there raised. Throughout, attention focuses on the reputation of the applicant and his relationship to the community and the particular intended use. And all too often the administrative or legislative determination seems to turn on the identity of the applicant or intended user, rather than upon neutral planning and zoning principles.
>
> The error in this approach, however, is lack of adherence to the fundamental rule that zoning deals basically with land use and not with the person who owns or occupies it. While it is proper for a zoning board to impose appropriate conditions and safeguards in conjunction with a change of zone or a grant of a variance or special permit, such conditions and safeguards must be reasonable and relate only to the real estate involved without regard to the person who owns or occupies it.
>
> [*Id.* at 871, 324 *N.E.*2d 870 (citations omitted).]

### III

We hold that the 1956 variance that permitted Saks to use the residentially-zoned portion of its property for parking accessory to its department store use, and the 1968 variance that permitted Saks to expand its building into the residentially-zoned portion of its property, are applicable to and may be relied on by S & S in its proposed use of the property for a retail supermarket. That

holding does not imply that all successors in interest to property that has benefitted from a use variance may assert the rights accorded by that variance, and we shall address in this opinion the considerations that may justify limitations on a successor's right to rely on a use variance. Nor are we insensitive to the contentions of respondents that S & S's proposed use may involve longer hours, more traffic, and a greater volume of business than did the Saks use.

Notwithstanding the prospect of a more intense use of the property, and the obvious distinction between the businesses carried on by a department store and by a supermarket, the factor that is decisive to our disposition is that the municipal ordinance in effect when S & S submitted its application treated the two uses identically. Pursuant to the 1993 Springfield Land Use Ordinance, the following eleven uses were permitted in the GC zone: (1) Church or other place of worship parish house, Sunday school, church school; (2) Municipal building or use; (3) Public School, park, playground or other quasi-public use; (4) Retail sales and service stores; (5) Business and professional offices; (6) Medical offices and immediate medical care facilities; (7) Bank and financial institutions; (8) Private schools; (9) Indoor movie theater; (10) Shopping centers containing any of the above permitted uses; (11) Child care center. The ordinance's definition of "Retail Sales and Services," *supra*, at 423, 744 *A*.2d at 1172, includes the "sale of goods for use or consumption off the premises, which goods are intended to meet direct consumer *food, clothing* ... or other needs ...." (emphasis added). That Springfield classifies both retail department stores and retail food stores under the same permitted use category in its zoning ordinance establishes beyond dispute that the two uses are sufficiently congruent to make available the variances obtained by the department store use to the proposed supermarket use.

Other considerations support that legal conclusion. Our cases recognize the applicability of the doctrine of *res judicata* to the decisions of boards of adjustment. *See Bressman v. Gash,* 131

*N.J.* 517, 526–27, 621 *A*.2d 476 (1993); *Russell v. Bd. of Adj. of Tenafly,* 31 *N.J.* 58, 65–66, 155 *A*.2d 83 (1959). We observed in *Bressman* that "[a]s a general rule, an adjudicative decision of an administrative agency 'should be accorded the same finality that is accorded the judgment of a court.' " 131 *N.J.* at 526, 621 *A*.2d 476 (quoting *Restatement (Second) of Judgments* § 83 cmt. b (1982)). Although our application of *res judicata* to board of adjustment proceedings has not been rigid, *Russell, supra,* 31 *N.J.* at 65–67, 155 *A*.2d 83, we cannot ignore the clarity and decisiveness of the Springfield Board of Adjustment's finding in 1956 that "the residence zoned portion of the subject premises [does] not lend [itself to] the construction of houses," and its finding in 1968 that "since the store is located where it is, the area into which applicant seeks to extend the store is no longer suited for residential use."

When the Springfield Board determined in 1996 that S & S was required to seek new variances, the only variances required were the right to use the residentially-zoned portion of the property, now zoned S–75 rather than S–120, for parking (under S & S's first alternative proposal), and the right to use the residentially-zoned part of the property for a smaller portion of building area that was used by Saks (under S & S's second alternative proposal). In our view, the Board could not reasonably be permitted to contradict its earlier findings that residential development of the residentially-zoned portion of the property was inappropriate because "it would abut immediately on a business zone," that residential development would be "incompatible with the established patterns of homes in the [abutting] residential area," and that the "highest and best use" of the residential parcel would be achieved by the "integrated development" of the entire parcel for a retail commercial use. Nor could the Board justifiably rescind its 1956 conclusion that the statutory negative criteria had been satisfied in that the use of the residentially-zoned portion of the property for accessory parking would not substantially impair the zone plan or be substantially detrimental to the public good. We infer that the force of the reasoning underlying those findings has been

strengthened by the passage of more than forty years during which the residentially-zoned portion of the premises continuously has been used for retail commercial purposes.

Our disposition of this appeal also is supported by our decision last term in *Rogers v. Zoning Board of Adjustment of the Village of Ridgewood,* 158 *N.J.* 11, 726 *A.*2d 258 (1999). In *Rogers* we invalidated an ordinance of the Village of Ridgewood that required all non-conforming sign structures that were accessory to primary commercial uses to be removed if the primary use was changed. The ordinance was challenged when the Village attempted to cause the removal of a non-conforming sign because a building previously occupied as an insurance office would in the future be occupied by a nail salon, both uses being permitted by the Village ordinance. Affirming the Appellate Division's invalidation of the ordinance, 309 *N.J.Super.* 630, 707 *A.*2d 1090 (1998), which in turn relied on Judge Skillman's dissent in *Camara v. Board of Adjustment of Belleville,* 239 *N.J.Super.* 51, 61, 570 *A.*2d 1012 (App.Div. 1990), we held that the Village ordinance could not deprive the property owner of the statutory protection afforded to non-conforming accessory structures, *N.J.S.A.* 40:55D–68, merely because of a change from one permitted primary use to another. Because uses granted by variance enjoy a higher status under our law than do non-conforming uses, see *Industrial Lessors, supra,* 119 *N.J.Super.* at 183, 290 *A.*2d 737, the Township of Springfield cannot be permitted to afford less protection to the use variance for accessory parking on the S & S property than the Village of Ridgewood was required to afford to accessory non-conforming signs. In both instances, the change from one permitted use to another does not permit the municipality to terminate the accessory use, whether it be non-conforming or the result of a use variance.

■ We also note that the objectors' reliance on the "very upscale," "very expensive" quality of the Saks merchandise and its "dignified" atmosphere fails to take into account the possibility that Saks could have sold its property during the intervening

years to less "dignified" department store retailers whose hours of operation, sales volume, and traffic patterns might have been far more intrusive on the neighborhood than was the Saks operation. That possibility of Saks' sale, or its own conversion, to a busier, more intense retail department store use—which indisputably could rely on the earlier variances—points up the wisdom of the warning sounded by the New York Court of Appeals in *Dexter, supra,* 365 *N.Y.S.*2d 506, 324 *N.E.*2d at 871, that "all too often the administrative ... determination seems to turn on the identity of the applicant or intended user, rather than upon neutral planning and zoning principles." The lesson is that in granting use variances boards of adjustment must anticipate that users in the same use category as the applicant, but with different merchandising characteristics, may someday occupy the property and claim the benefit of the prior variance. The question is not whether the successor use is "essentially duplicative" of the use for which the variance was granted, as our dissenting colleagues suggest, *post* at 446, 744 *A.*2d at 1185, but rather whether, considering all relevant factors, the successor use is sufficiently similar to the variant use to afford it the benefit of the variance. In this case, the parking lot use for which the variance was granted remains unchanged, except that it will be a use accessory to a supermarket rather than a department store. The Township of Springfield, by classifying those two uses identically within its zoning ordinance, has demonstrated that the distinction does not constitute a valid basis for denying S & S the benefit of the prior variances.

We emphasize that the municipality is not powerless to address the specific problems that may be presented by S & S's proposed use of the property. Pursuant to the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –129, municipal planning boards possess a broad reservoir of authority to review and approve site plan applications, *N.J.S.A.* 40:55D–50, and to insure compliance with the provisions of the local site plan ordinance. *See N.J.S.A.* 40:55D–41. Such review typically encompasses such issues as location of structures, vehicular and pedestrian circulation, park-

ing, loading and unloading, lighting, screening and landscaping. We anticipate that the Springfield Planning Board, informed by the concerns of residents in the vicinity of the property, will impose appropriate conditions and restrictions on S & S's proposed development and use of the property in order to minimize any intrusion on or inconvenience to the continued use and enjoyment of those neighboring residential properties.

## IV

We note that a more difficult issue suggested by this appeal, which we need not resolve, is the standard that a municipality should apply in determining what limits it may properly impose on the right of a successor in title to enjoy the benefit of a use variance granted to a prior owner of the property. That issue appears to be one of first impression, and we find no cases decided by our courts or in the courts of other states that illuminate our analysis.

That question is simplified where, as here, the successor use either is identical to the prior use or is placed in the same use category by the municipal zoning ordinance. However, if the use for which the prior variance was granted is less common than a retail or office use, and is a use not included among the permitted uses in the ordinance, the determination whether a successor in interest has the right to use the property for a different use, but one with characteristics that are comparable to the use granted by variance, may be difficult indeed. A variance to permit an indoor tennis court to operate in a residential zone may fairly be claimed by a successor in title intending to offer racquetball, squash, and an indoor pool, but the claim would be more tenuous if the next successor proposes to operate a bowling alley serving food and drink on the premises.

At its outer limits resolution of the issue may be elusive, but we reject as too restrictive our dissenting colleague's standard requiring the successor or use to be "essentially duplicative" of the variant use. *Post* at 446, 744 *A*.2d at 1175. We anticipate that

local zoning boards and officials will fairly consider in their discretionary determinations the functional similarities and differences between the uses at issue, whether in accordance with sound planning principles the proposed use generally would be includable in the same use classification as the use for which the variance was granted, as well as whether the board that granted the initial variance reasonably could have anticipated that its scope could encompass the use subsequently proposed. Too restrictive an interpretation of the scope of a prior variance could diminish unreasonably the value of property assumed to have enjoyed the benefit conferred by the earlier variance. *Soho Park Land Co., supra,* 6 *N.J. Misc.* at 687, 142 *A.* 548. Skilled counsel to Boards of Adjustment should inform their clients that in deliberating on use variance applications recognition should be given to the prospect that successor owners may propose to use the property for uses different from but related to the use for which the variance is sought.

Finally, although we granted the motion of two Intervenors to supplement the record with the provisions of the 1999 amendments to the Springfield Zoning Ordinance, those amendments, even if they survive the challenge now pending in the Law Division, cannot affect S & S's right to develop and use the property. If the amendatory ordinance is sustained, S & S's proposed retail use would be protected by the MLUL as a nonconforming use. See *N.J.S.A.* 40:55D-68.

V

We reverse the judgment of the Appellate Division and remand the matter to the Township of Springfield for further proceedings consistent with this opinion.

COLEMAN, J., dissenting.

The question presented by this appeal is not whether a variance runs with the land, about which there is no debate. The Appellate Division in this case acknowledged that "use variances are not

personal to the owner, but run with the land." *Stop & Shop, supra,* 315 *N.J.Super.* at 434, 718 *A.*2d 1218. Rather, the question is whether the new owner's intended use of the land so significantly differs from the variant use as to unreasonably affect a legitimate land use purpose. *Berninger v. Board of Adjustment,* 254 *N.J.Super.* 401, 405, 603 *A.*2d 954 (App.Div.1991), *aff'd o.b.,* 127 *N.J.* 226, 603 *A.*2d 946 (1992). Unlike the majority, I would affirm the decision of the Springfield Board of Adjustment (Board). Stop & Shop (S & S) failed to present evidence showing that its intended use of the property is significantly similar in kind, nature, or use intensity to the retail merchandising conducted by Saks Fifth Avenue (Saks), in terms of the qualitative nature and intensity of use of the parking lot.

Absent proofs to the contrary, the Board could infer that S & S's intended use of the premises to conduct business activities related to the operation of a mega supermarket differs substantially from Saks's operation of an upscale retail department store. The Board also could reasonably infer that the change in use will substantially increase vehicular and pedestrian traffic and hours of operation that will have a significant and unreasonable land use impact. I wholeheartedly agree with the Appellate Division that because S & S failed to demonstrate that its proposed use does not represent an insubstantial change in the variant use, a new application to the Board was required. *Stop & Shop, supra,* 315 *N.J.Super.* at 431, 437, 718 *A.*2d 1218. Hence, I dissent from the majority's contrary holding.

## I.

In 1956, the Board granted a use variance permitting Saks to use the rear portion of the property for a parking lot accessory to its planned retail department store. The Board found that the rear portion of the property did not "practically lend [itself to] the construction of houses." In 1968, the Board granted Saks another use variance, allowing it to extend the rear portion of its store into the residential zone. The Board found that the extension would

not impair the value or use of the surrounding areas. Thus, Saks was granted a variance to operate a suburban department store with off-street parking in the rear.

S & S purchased the property in 1996 without any contingency, intending to construct and operate a mega supermarket. S & S applied to the Springfield Zoning Officer for a permit authorizing such use of the property. The officer denied the application, finding that S & S was required to apply to the Board for a new use variance. S & S appealed to the Board and sought a special question interpretation regarding the extent to which S & S was entitled to rely on the Saks variances. At the hearing, S & S presented a witness who testified that S & S intended to erect a new 85,443 square foot supermarket with seven loading docks. The existing building is 83,330 square feet with one loading dock. Three objectors testified, complaining mostly about the potential for increased truck and automobile traffic and noise.

On May 26, 1996 the Board concluded that S & S needed to apply for a new use variance. Specifically, the Board found that S & S "has not demonstrated ... that the supermarket business it intends to operate on the property ... is of a similar nature, kind or use intensity as that of the Saks operation...." S & S appealed the Board's decision to the Law Division. A group of residents, called the Colonial Association, and the Township of Millburn, were allowed to intervene as defendants.

The Law Division ruled that the Board abused its discretion, and therefore, S & S did not need a new use variance. The court noted that most of the existing building is located in the commercial zone, where supermarkets are permitted by ordinance. Regarding the rear expanded portion of the store and the entire parking lot, both of which are located in the residential zone, the court concluded that S & S's proposed uses are in conformity with the variances previously granted to Saks. The court further found that whether S & S's use of the property was qualitatively similar to Saks's use was irrelevant because the Springfield zoning ordi-

nance does not distinguish between types of "retail and service stores."

The Appellate Division reversed the trial court's decision in a published opinion. 315 *N.J.Super.* 427, 437, 718 *A.*2d 1218 (1998). The appellate panel concluded that "a use created by a variance may not be significantly altered or intensified without further application to the board of adjustment." *Id.* at 434, 718 *A.*2d 1218. The panel noted the strong policy in favor of land use planning by ordinance rather than by variance. *See also Elco v. R.C. Maxwell Co.,* 292 *N.J.Super.* 118, 126, 678 *A.*2d 323 (App.Div.1996). The panel acknowledged that although variances run with the land, the scope of the use permitted by the variance is limited to those uses that are essentially duplicative of the use contemplated by the original variance. The court found guidance in cases involving the expansion or enlargement of a nonconforming use. Therefore, "any proposed change in the use ... that is not negligible or insubstantial should require further consideration by the board of adjustment." *Stop & Shop, supra,* 315 *N.J.Super.* at 436–37, 718 *A.*2d 1218. Furthermore, the court noted that S & S presented no evidence that its proposed use was qualitatively similar to the prior use by Saks. *Id.* at 437, 718 *A.*2d 1218.

## II.

The two variances granted to Saks pursuant to our present day *N.J.S.A.* 40:55D–70d required a showing of special reasons and satisfaction of the negative criteria. Variances should be strictly construed because they are to be granted only upon a showing of special reasons. *See Burbridge v. Mine Hill Zoning Bd. of Adj.,* 117 *N.J.* 376, 384–85, 568 *A.*2d 527 (1990). A variance allows relief from restrictions imposed by ordinances that are otherwise uniformly applicable to the zone as a whole. *Elco, supra,* 292 *N.J.Super.* at 126, 678 *A.*2d 323. Variances should be granted sparingly because they "impair sound zoning" and because of "the strong legislative policy favoring land use planning by ordinance rather than by variance." *Ibid.; see also N.J.S.A.* 40:55D–62;

*Kohl v. Mayor & Council of Fair Lawn,* 50 *N.J.* 268, 275, 234 *A.*2d 385 (1967).

The Board was interested in hearing evidence from S & S to permit the Board to determine whether the impact on the zone created by the intended mega supermarket business would be substantially similar to that of Saks's operation. S & S elected not to present such evidence. I believe the Board should be permitted to determine, on a case-by-case basis, whether a proposed change in the variant use is significant enough to require a new use variance. I believe that is what the Legislature intended when it provided in *N.J.S.A.* 40:55D–70a that appeals from a zoning officer's interpretation of a variance must be heard by the Board. The Board's concern advances legitimate land use purposes and does not represent any attempt to limit the life of the variances issued during the original grantee's ownership of the property.

The Board was likely concerned about whether S & S's mega supermarket would substantially alter its prior determination regarding the negative criteria and, therefore, cause violence to the zoning plan. Both the 1956 and 1968 variances were required because Saks wanted to expand its commercial operations into a residential zone. In other words, most of the land required for the parking lot and the store's 19,000 square foot expansion was zoned residential, then and now. Although the land use ordinance involved here permits retail stores on the commercially zoned portion of the property for off-premises consumption of the products sold, a mixed commercial use ordinance "does not signify every type of commercial use." *Manalapan Realty v. Township Comm. of Manalapan,* 140 *N.J.* 366, 385, 658 *A.*2d 1230 (1995). Moreover, "the law presumes that boards of adjustment . . . will act fairly and with proper motives and for valid reasons." *Kramer v. Board of Adjustment, Sea Girt,* 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965).

Increase in traffic is a legitimate concern of the Board both when considering whether to approve use variances in the first

instance, *Price Co. v. Zoning Bd. of Adjustment of Union,* 279 *N.J.Super.* 327, 334, 652 *A.*2d 784 (Law Div.1993), *aff'd,* 279 *N.J.Super.* 207, 652 *A.*2d 723 (App.Div.1994), and when considering whether a new proposed use is substantially different from the variant use. S & S's need for seven loading docks for its large truckloads of merchandise in contrast to Saks's need for only one dock graphically depicts the anticipated substantial increase in traffic and hours of operation. Virtually all of the parking lot for 750 cars and about 15.5 percent of the store area are located in a residential zone. The Board is thoroughly familiar with its community and is vested with wide discretion to determine whether the proposed use would substantially alter its prior determination of the negative criteria. *See Ward v. Scott,* 16 *N.J.* 16, 23, 105 *A.*2d 851 (1954); *Kramer, supra,* 45 *N.J.* at 296, 212 *A.*2d 153.

The non-conforming use cases that focus on expanding those uses are instructive. There are two basic types of non-conforming uses. The most commonly recognized illustration is one that preexisted "the adoption of the ordinance which rendered the use or structure nonconforming." *N.J.S.A.* 40:55D–68. The second type of non-conforming use arises when a variance is created by a zoning board of adjustment pursuant to *N.J.S.A.* 40:55D–70c and d, by a planning board pursuant to *N.J.S.A.* 40:55D–60a, or as otherwise provided by law. *See Pieretti v. Mayor & Council of Bloomfield,* 35 *N.J.* 382, 387, 173 *A.*2d 296 (1961); *Township of Stafford v. Zoning Bd.,* 299 *N.J.Super.* 188, 192–93, 690 *A.*2d 1043 (App.Div.1997), *aff'd,* 154 *N.J.* 62, 711 *A.*2d 282 (1998); William M. Cox, *New Jersey Zoning and Land Use Administration* § 11–1.2 (1999 ed.).

The fact that the controlling ordinance permitted Saks to operate a retail store in the zone was relevant only to the special reasons requirement for the section 70d use variance. The Board's position focuses on whether the proposed use will substantially affect its prior negative criteria determination. That concern is consistent with this Court's suggestion in *Paruszewski v. Township of Elsinboro,* 154 *N.J.* 45, 56–57, 711 *A.*2d 273 (1998),

that, when an applicant seeks a certificate of non-conformity under *N.J.S.A.* 40:55D–68 and there exists a concern about the need to protect the integrity of either the master plan or the zoning scheme, the applicant may be required to submit proofs substantially similar to those required to satisfy the negative criteria for a section 70d variance. Under the Municipal Land Use Law separation of powers doctrine, *N.J.S.A.* 40:55D–20 and *N.J.S.A.* 40:55D–70, the issue of whether S & S's intended use of the property is essentially duplicative of the variant use lies within the Board's exclusive jurisdiction. Planning boards' authority to impose land use restrictions is generally limited to applications for subdivision, site plan, and conditional use approval. *N.J.S.A.* 40:55D–60; *Dresner v. Carrara,* 69 *N.J.* 237, 240–41, 353 *A.*2d 505 (1976).

The majority concedes that not "all successors in interest to property that has benefitted from a use variance may assert the rights accorded by that variance." *Ante* at 435, 744 *A.*2d at 1178. Yet, the majority neither articulates a standard for determining which successor does not benefit from the variance nor indicate who makes the determination. Unlike the majority, I believe the Board was entitled to require S & S to prove that its intended use of the premises would not substantially alter the impact upon the zoning plan and the surrounding community. That uniform standard is required to guide the Board. The grant of a variance is subject to the conditions of the controlling ordinance. When there is a change in the structure or use for which a variance was obtained, the issue for the Board becomes whether the structure or variant use is "essentially duplicative in all respects of that previously in existence pursuant to the variance." *Industrial Lessors, Inc. v. City of Garfield,* 119 *N.J.Super.* 181, 183, 290 *A.*2d 737 (App.Div.), *certif. denied,* 61 *N.J.* 160, 293 *A.*2d 390 (1972). Thus, I agree with the appellate panel in the present case that a change in use is significant if it is not essentially duplicative of the original variant use. *Stop & Shop, supra,* 315 *N.J.Super.* at 436, 718 *A.*2d 1218.

*Industrial Lessors*, which also involved a variance, was reaffirmed last year by this Court in the non-conforming use case of *Rogers v. Zoning Bd. of Adjustment of Ridgewood*, 158 *N.J.* 11, 726 *A.*2d 258 (1999). There, we approved the Appellate Division's adoption of Judge Skillman's dissenting opinion in *Camara v. Board of Adjustment of Belleville*, 239 *N.J.Super.* 51, 61, 570 *A.*2d 1012 (App.Div.1990), wherein he stated that when there is a change from one permitted use to another, the only issue is whether the change in use has substantially changed the non-conforming structure. *Id.* at 63, 570 *A.*2d 1012. Similarly, where there exists a non-conforming use or variance regarding off-street parking, a change in the nature and intensity of the principle business to which the parking is accessory allows a board of adjustment to decide whether the non-conforming use or variant use should continue. *See Wawa Food Market v. Planning Bd.*, 227 *N.J.Super.* 29, 37, 545 *A.*2d 786 (App.Div.), *certif. denied*, 114 *N.J.* 299, 554 *A.*2d 853 (1988).

In the present case, the upscale Saks department store is nothing like a mega supermarket. Traffic will obviously be heavier given the nature of the supermarket business. For me, that the proposed change in use is significant is almost as obvious as the difference between a restaurant and a discotheque, recognized in *Town of Belleville v. Parrillo's, Inc.*, 83 *N.J.* 309, 314–15, 416 *A.*2d 388 (1980). To assist in determining whether the proposed change in use is essentially duplicative, the reasons for granting the variance are instructive.

When granting the 1956 use variance, the Board made it plain that it was to facilitate the construction and operation of a "suburban department store with off-street parking." Such a store was a newly emerging concept. The Board was persuaded that the variance would *prevent* an increase in commercial and other traffic through residential neighborhoods. It also sought to enhance property values by productively developing the general area rather than allowing haphazard and *inconsistent* development. The Board concluded that the variance furthered the intent

and purpose of the zoning ordinance by allowing an upscale department store to operate in this suburban neighborhood.

When the use variance was approved in 1956, the Board found that the intended use was consistent with then-existing land use ordinances. It was not possible for the Board or the planner in 1956 to anticipate future potential retail uses on a scale of S & S's intended mega supermarket that would have caused the Board to deny or place specific conditions on the original use variance. Nor was it possible for the Board to foresee that, when it stated in 1956 that the residential portion of the property did not lend itself to the construction of houses, this Court would eliminate exclusionary zoning in the *Mount Laurel* cases, 67 *N.J.* 151, 336 *A.*2d 713 (1975) and 92 *N.J.* 158, 456 *A.*2d 390 (1983), or that the Legislature would enact the New Jersey Fair Housing Act of 1985, *N.J.S.A.* 52:27D–301 to –329, requiring even municipalities with virtually no undeveloped land to contribute a fair share of affordable housing.

I, therefore, reject the majority's determination that the Board's 1956 conclusion that the land used for the parking lot was unsuitable for housing is *res judicata.* Common sense dictates that the *Mount Laurel* doctrine has forced many municipalities, planning boards, and boards of adjustment, including Springfield, to revisit many earlier decisions affecting housing. Moreover, this Court has recently recognized that even in a case in which *res judicata* is applicable, it does not preclude a board of adjustment from considering a second application for a variance if the application contains sufficient changes. *Bressman v. Gash,* 131 *N.J.* 517, 527, 621 *A.*2d 476 (1993); *Russell v. Board of Adjustment of Tenafly,* 31 *N.J.* 58, 66, 155 *A.*2d 83 (1959).

### III.

The scope of review of the Board's decision requires a reviewing court to give deference to the Board's discretionary determination. That decision should not be overturned absent a showing that it was arbitrary, capricious, or unreasonable. *Bressman, supra,* 131

*N.J.* at 529, 621 *A.*2d 476.   Because I find the Board acted properly, I would affirm the judgment of the Appellate Division.

Justice GARIBALDI joins in this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices O'HERN, STEIN, LONG and VERNIERO—5.

*For affirmance*—Justices GARIBALDI and COLEMAN—2.