LEONARD KOHL, PLAINTIFF-APPELLANT, v. MAYOR AND COUNCIL OF THE BOROUGH OF FAIR LAWN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, THE BOARD OF ADJUSTMENT OF THE BOROUGH OF FAIR LAWN, NICHOLAS POSTMA, BUILDING INSPECTOR OF THE BOROUGH OF FAIR LAWN, AND FAIR LAWN DAIRIES, INC., DEFENDANTS-RESPONDENTS.

Argued September 12, 1967—Decided October 23, 1967.

*Mr. Howard Stern* argued the cause for plaintiff-appellant (*Messrs. Shavick, Thevos, Stern, Schotz & Steiger,* attorneys; *Mr. Howard Stern,* of counsel).

*Mr. James A. Major* argued the cause for defendant-respondent, Fair Lawn Dairies, Inc. (*Messrs. Major & Major,* attorneys; *Mr. James A. Major,* of counsel; *Mr. James A. Major* II on the brief).

The opinion of the court was delivered by

PROCTOR, J. By this action in lieu of prerogative writs, plaintiff challenges the grant of a zoning variance which permits the defendant, Fair Lawn Dairies, Inc. (Dairies), to expand its nonconforming industrial use in a residential zone in the defendant Borough of Fair Lawn. Plaintiff is a resident and taxpayer of the Borough and owns a home within 200 feet of Dairies' nonconforming milk processing and bottling plant.

The variance was granted to Dairies by the Mayor and Council of the Borough upon the recommendation of the Board of Adjustment. *N. J. S. A.* 40:55–39(d). The Superior Court, Law Division, upheld the grant of the variance and the Appellate Division affirmed. We granted plaintiff's petition for certification. 48 *N. J.* 144 (1966).

Defendant's dairy has existed on the present tract of about 4 acres in Fair Lawn for the past 40 years. Apparently the dairy originally was a small family operation, but over the years has increased—partially through a merger in 1952

with a larger dairy—to a business now grossing over 17 million dollars annually and employing 145 persons. Since the Borough first enacted its zoning ordinance in 1933 Dairies has been located in a residential zone and has conducted its milk processing, bottling, and distributing operation as a nonconforming use. Although no homes were in the area originally, residences since have been built on the land surrounding the dairy and it is agreed that at the present time the area is a "high class residential neighborhood."

For a proper understanding of this case, it is useful to review the recent history of Dairies' operation. In 1954 Dairies, without applying for a variance, began construction of some new buildings on the premises. A suit was instituted by a group of neighboring homeowners to enjoin this construction and compel removal of the buildings already partially erected. The suit was settled by a stipulation in which the plaintiffs agreed not to object to a pending application by Dairies for a variance which would permit the construction and operation of the aforesaid buildings. In return, Dairies agreed that it would not make any further applications for variances from the zoning laws of the Borough. The agreement, which imposed certain other conditions on Dairies' use of its premises, was to be for a term of 30 years. The variance thereafter was granted and the construction of the buildings was permitted.

In 1962 Dairies again expanded its facilities and one of the parties to the 1954 agreement instituted a second action against Dairies alleging violation of that agreement and requesting specific performance thereof. The Borough of Fair Lawn, named as a defendant in that suit, cross-claimed against Dairies alleging that it had violated a condition of the 1954 variance by building a cinder block wall to enclose part of a loading platform and by conducting bottle washing operations thereon. After a hearing in the Chancery Division Judge Pashman enjoined Dairies from using the loading platform for bottle washing and ordered that the bottle

washing equipment and the wall built to enclose it be removed. The court held, however, that Dairies' promise not to seek a variance for 30 years after the 1954 agreement was not specifically enforceable. The operation of the injunction was stayed for one year to permit Dairies an opportunity to apply for a variance to legalize the use of the loading platform for bottle washing or to make other arrangements. Thereafter Dairies applied for the variance which is the subject of the present review. The application, however, went far beyond a request to continue the use enjoined by the Chancery Division (which use would require no new construction). According to the plans submitted with Dairies' application for a variance the following construction is proposed:

1. A two-story addition, 76′ by 115′, to the existing processing plant erected pursuant to the 1954 variance. This addition would replace two small frame buildings adjacent to the processing plant and would be joined with a new second floor to be constructed on the processing plant, creating a completely new structure having dimensions of 115′ by 195′.

2. A 50′ by 115′ addition to an existing storage building which now has dimensions of 30′ by 115′.

3. A covered boomerang-shaped loading dock beginning at the rear of the existing processing plant and running along Dairies' property line for a distance of 478 feet. The loading dock would be 25 feet in width, about 14 feet in height, and would contain a conveyor belt extending its full length. The plans show that the loading dock would accommodate 32 vehicles at one time.

4. The premises are to be virtually enclosed by an eight foot cinder block wall and by the rear wall of the loading dock which would be about 14 feet high.

5. The property is to be completely paved with blacktop.

It is estimated that the cost of this new construction will be $500,000. The new construction consists of at least

35,180 square feet of floor space,[1] replacing 6,300 square feet in the frame structures which are to be razed to make way for the addition to the processing plant.

At the hearing before the Board of Adjustment, Dairies' architect presented the plans of the proposed construction and testified that in his opinion the proposal would bring about a safer condition with respect to fire hazards because the nonfireproofed frame buildings would be replaced by fireproof structures. He also said that the appearance of Dairies' plant would be improved and that noise would be decreased since the new wall would block off the view of the activities now present at the dairy and would deaden the sound about which the neighbors had complained. Dairies' only other witness was a real estate expert who offered his opinion that the new construction would have no deleterious effect on the neighborhood but, to the contrary, would "enhance . . . the property values of those properties surrounding it." Dairies concluded its presentation by introducing into evidence Judge Pashman's opinion in the 1962 Chancery litigation.

The sole witness offered by the objectors was a real estate expert who said that the new construction would depreciate the value of properties in the area, particularly those residences the rear yards of which abutted the proposed site of the loading dock.

The Board of Adjustment recommended the variance in accordance with the plans submitted upon the condition that appropriate shrubbery be planted at the front of the processing plant and along the proposed wall. Subsequently the Mayor and Council approved the Board's recommendation,

---

[1] The figure of 35,180 square feet of new floor space was given by Dairies' architect and accepted in all prior proceedings. Although unnecessary to our disposition of the case, we note that this figure apparently does not include a basement in the new addition to the processing plant and the second floor to be constructed on the existing processing plant. If the area of these two items of new construction is included, we calculate the total new floor space to be approximately 57,605 square feet rather than 35,180 square feet.

imposing several minor conditions.[2] The recommendation of the Board of Adjustment upon which the Mayor and Council acted set forth the following pertinent findings which we take to be the special reasons for the grant of the variance:

"Milk is an indispensable article of food and its distribution and processing is vital to the health and welfare not only of the Borough of Fair Lawn but of all municipalities which are serviced by the applicant. This Board is faced with the inescapable fact that the dairy is a nonconforming use and that its future maintenance cannot be proscribed. So long as the dairy is to be there it will best serve the public welfare if the premises are made as attractive as possible and the dairy permitted to use the premises with a maximum of efficiency and use of the property for dairy purposes.

"The testimony clearly indicates that the replacement of the existing buildings with modern fireproof structures will not only improve applicant's property but surrounding properties and will decrease the hazard which may have existed in relation to fire and other objections. The proposed structures will unquestionably increase the esthetic value of the dairy and as a result thereof decrease any possible objection concerning the de-valuation of surrounding property.

&ast; &ast; &ast; &ast; * * * *

"The dairy's continuous use of the premises for more than 40 years last past should not be endangered or terminated by refusing it permission to modernize and expand within the limitations of the area now owned by it."

The Board also found that the granting of the variance would not substantially impair the intent and purposes of the zoning plan and ordinance and would not be detrimental to the public good.

The plaintiff's suit alleged, among other grounds, that the above action of the municipal bodies was arbitrary, capricious, and unreasonable in that sufficient special reasons, required for relief under *N. J. S. A.* 40:55–39(d), did not exist and that the negative criteria of the statute had not been satisfied.

The trial court found for the defendants. On appeal the Appellate Division affirmed in an unreported opinion hold-

---

2 One of the conditions imposed was that the wall be set back five feet from Dairies' property line. The zoning ordinance of Fair Lawn requires a ten foot side yard setback.

ing that the grant of the variance by the municipal bodies was supported by sufficient special reasons: 1) the general welfare was served because "the public interest is vitally concerned with the ready supply of milk from an accessible local distribution plant"; 2) the "proposed construction of fireproof buildings in place of buildings of frame or other inflammable construction is in aid of public safety . . ." The Appellate Division further held that the negative requirements of *N. J. S. A.* 40:55–39(d) were satisfied "by a finding that the improved aesthetic value of the dairy will tend to decrease possible devaluation of surrounding properties occasioned by the extension of the dairy operation."

On this appeal the plaintiff's primary contention is that there were no sufficient special reasons to warrant the expansion of defendant's nonconforming use. Dairies maintains that special reasons are presented by the following:

"1. The aesthetic character of the activity would be greatly improved.

2. The danger of fire would be decreased by replacing frame buildings with modern fire-proof structures. This would be of benefit not only to the property owners but to the employees and visitors.

3. The sound-proofing of the buildings would minimize any noise from the operation.

· 4. Property values in the neighborhood would be enhanced.

5. The public welfare would be served by insuring a supply of milk and dairy products."

■■ Variances to allow new nonconforming uses should be granted only sparingly and with great caution since they tend to impair sound zoning. *Grundlehner v. Dangler,* 29 *N. J.* 256, 266 (1959); *Beirn v. Morris,* 14 *N. J.* 529, 536 (1954); *Lumund v. Board of Adjustment of Borough of Rutherford,* 4 *N. J.* 577, 585 (1950). While our courts have recognized that the determinations of the local governing bodies are not to be viewed with a general feeling of suspicion and are not to be overturned unless arbitrary or unreasonable, they have consistently required that local zoning action comply with the statutory requirements. See *Andrews v. Ocean Twp. Board of Adjustment,* 30 *N. J.* 245,

249 (1959). For the granting of a variance under subsection (d) of *N. J. S. A.* 40:55–39, two critical findings are required: 1) that "special reasons" exist for the variance; 2) that the variance "can be granted without substantial detriment to public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance."

In the first opinion in *Ward v. Scott,* 11 *N. J.* 117 (1952), this Court rejected the contention that subsection (d) of the statute was unconstitutional for want of a sufficient standard for the term "special reasons." We held that this language gained validating content from the purposes of zoning set forth in *N. J. S. A.* 40:55–32.[3] No more specific standards for special reasons have been given by our courts beyond those general standards of Section 32. Because of the nature of the subject no precise formula is feasible and each case therefore must turn on its own circumstances. *Andrews, supra* at 251. However, the lack of a precise formula does not mean that carte blanche has been given to local governing bodies in finding special reasons for the grant of variances. Otherwise, variances could be awarded indiscriminately merely because they do not offend the negative criteria of the statute.

In the present case we conclude that the special reasons set forth by the governing bodies, the courts below, and Dairies are insufficient to sustain the grant of the variance. We recognize that special reasons are to be viewed in their aggregate and not in isolation. We here consider each of

---

[3] *N. J. S. A.* 40:55–32 provides:

Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, flood, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality.

the special reasons advanced in relation to the proposed construction as a whole since Dairies does not contend that differing special reasons exist for each item of new construction. Rather, it is argued that each special reason cited supports the variance in its entirety.

We do not question the finding of the Board of Adjustment that the new construction would result in a more attractive plant than exists at present. While we do not decide · whether esthetic considerations may provide a special reason for the grant of a variance in a proper case, they do not support this proposed construction of a half-million dollar expansion of an industrial complex in a residential zone. To justify the extensive expansion contemplated here by the increase in attractiveness of the property would open the way for any land to be used for any purpose, so long as the negative criteria are satisfied, if the facilities housing the use make the premises prettier than formerly. Such result would be contrary to established fundamentals of sound zoning. See *Pieretti v. Mayor and Council of Town of Bloomfield*, 35 *N. J.* 382, 388–389 (1961), where this Court held that similar considerations—including the screening of unsightly activities from view—did not constitute special reasons for a variance to enlarge a nonconforming use. See also *Monmouth Lumber Co. v. Ocean Township*, 9 *N. J.* 64 (1952). We may take judicial notice that in this state there are many industrial plants which because of their architecture and landscaping present a more attractive appearance than many residences. But this cannot justify the intrusion of such plants into an area zoned solely for residential use.

We also need not decide whether, as Dairies contends and the Appellate Division held, the replacement of frame structures by fireproof buildings constitutes a special reason for the grant of the variance since by no stretch of the imagination can the construction here contemplated be deemed a "replacement." The variance granted in the present case permits not merely the replacement of two relatively small

frame structures but allows more than a five-fold increase in floor space compared with the buildings to be removed. The undisputed facts in the case show that 6,300 square feet of non-fireproof office floor space is being "replaced" by 35,180 square feet of fireproof space. Certainly, denominating this more than five to one exchange as a "replacement" is egregious understatement. The planned "replacement" more than doubles the size of Dairies' existing facilities. Moreover, we can discern no relationship between the elimination of a fire hazard and the contemplated construction of the fourteen foot high loading dock protruding more than the length of a football field and a half along the property line.

The evidence does not support Dairies' contention that the soundproofing of the buildings would minimize noise from the operation and thus provide a special reason for the granting of the variance. According to Dairies' architect, only the new office building would be soundproofed and nothing will be done to the remaining existing buildings which will decrease the sound emanating from them. It is more likely that the soundproofing of the office building is intended to protect the employees therein from the sound of operations outside rather than to shield the surrounding homeowners from the noise, if any, created by the office workers. There was testimony that the eight foot wall around the property and the fourteen foot wall to be created at the rear of the loading dock would lessen the noise about which neighbors have complained. However, it is obvious that the major expansion here contemplated in the milk processing and distribution plant with the attendant increase in the traffic and loading of trucks would result in more noise than is created by the existing facilities. From the record it cannot be determined whether this increase in noise accompanying Dairies' expanded operations would not more than off-set any benefit the wall might provide.

The next special reason urged by Dairies is that "property values in the neighborhood would be enhanced" by the new

construction. The expert testimony adduced by the parties on this point was in conflict: Dairies' expert stated that the value of nearby properties would be increased, while plaintiff's expert said that the expansion would devalue neighboring property. The Board, however, made no finding that property values in the neighborhood would be enhanced; it merely held that the negative criteria would be met because values would not be decreased.

The special reason emphasized by the Appellate Division, and which Dairies stresses here, is that the processing and distribution of milk "does serve the general welfare, as that affirmative criteria for the granting of a variance is now broadly interpreted . . ." We disagree that the interpretation is broad enough to encompass the present variance. The cases in this Court in which a significant factor has been the contribution of the proposed use to the "general welfare" all have involved uses which *inherently* served the public good. *Kunzler v. Hoffman,* 48 *N. J.* 277 (1966) ; *Burton v. Town of Montclair,* 40 *N. J.* 1 (1963) ; *Black v. Town of Montclair,* 34 *N. J.* 105 (1961) ; *Andrews v. Ocean Twp. Board of Adjustment,* 30 *N. J.* 245 (1959) (involving schools or, in *Kunzler*, a hospital). Of course, the processing and distribution of milk does serve the general welfare. However, this activity, unlike a school or hospital, does not in itself provide the basis for a finding of special reasons any more than does the manufacture and distribution of any other necessary commodity. In all the above cited cases the very nature of the use gave rise to special reasons for the grant of a variance, and in those cases we did not require a finding that the general welfare could be best served by locating the proposed use at the specific site in question. Where, however, the use is not of the type which we have held of itself provides special reasons, such as a school or hospital, there must be a finding that the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought. *Mocco v. Job,* 56 *N. J. Super.* 468, 477 (*App. Div.* 1959) ; Cunningham, "Control

of Land Use in New Jersey," 14 *Rutgers L. Rev.* 37, 93 n. 261 (1959) ; cf. *Kramer v. Board of Adj., Sea Girt,* 45 *N. J.* 268, 286 (1965). This is so because nearly all lawful uses of property promote, in greater or lesser degree, the general welfare. Thus, if the general social benefits of any individual use—without reference to its particular location—were to be regarded as an adequate special reason, a special reason almost always would exist for a use variance. Mere satisfaction of the negative criteria of the statute would then be all that would be required to obtain a variance under subsection (d). *Mahler v. Board of Adj. of Borough of Fair Lawn,* 94 *N. J. Super.* 173, 184 (*App. Div.* 1967). In *Ward, supra,* 16 *N. J.* 16, this Court approved a variance permitting construction of a supermarket in a residential zone. The use was permitted not because a supermarket *per se* serves the general welfare, but because a supermarket *at the particular location* did "meet current needs of nearby areas which have already been developed and future needs of other nearby areas which have not yet been developed." *Id.* at 22. Likewise, in *Yahnel v. Board of Adjustment of Jamesburg,* 79 *N. J. Super.* 509 (*App. Div.* 1963) a telephone wire center was permitted in a residential zone not merely because telephone facilities in general serve the public welfare but because the facts showed that suitable service could be provided only by establishing the wire center at the particular location.

In the present case there was no showing that the promotion of the general welfare could be accomplished only by an expansion of Dairies at its present location. No evidence was produced to show that the Borough or the surrounding area was dependent upon Dairies' existing plant for its milk supply. For all we know, there may be a number of milk distributors which could supply the territory. *Cf. Kunzler, supra* at 286–287, where it was shown that there was a shortage of facilities which the proposed use would alleviate. Even if it had been shown that Dairies' *present* plant was essential to the welfare of the area, there was not

the slightest evidence before the municipal bodies that the Borough of Fair Lawn and its environs have any need of the additional milk supply that would be created by an expansion of the facilities at the present location. As part of their findings with respect to the general welfare the governing bodies determined that "the dairy's continued use of the premises . . . should not be endangered or terminated by refusing it permission to modernize and expand within the limits of the area now owned by it." There was no evidence that the welfare of the Borough would be affected by the termination of Dairies' operation or by a relocation of the plant. In any event, this determination of the governing bodies is not supported by a scintilla of evidence indicating that this enterprise, which grosses 17 million dollars annually, is at all endangered or likely to be terminated. Therefore, we need not consider whether the possible termination of a nonconforming use would constitute a special reason sufficient to support a variance for its expansion.

As to the concept that Dairies should be permitted to expand to the limits of its property, the words of Chief Justice Case of the former Supreme Court are appropriate:

"Carried to its logical result, the argument * * * is that if a nonconforming use is once established on a property, that use may be extended and enlarged to the length and breadth of the entire plot without restraint as to height and depth. We do not understand that to be the law." *DeVito v. Pearsall*, 115 *N. J. L.* 323, 325 (*Sup. Ct.* 1935).

See also *Hay v. Board of Adjustment of Borough of Ft. Lee*, 37 *N. J. Super.* 461, 466–467 (*App. Div.* 1955).

██ Of course, the owner of a nonconforming use, like any other property owner, may be granted a variance in a proper case. In passing on such an application the governing body may consider the fact that a nonconforming use already exists on the premises and it is not necessary for an applicant to show that the variance properly could have been granted to create the nonconforming use in the first instance. *Black, supra; Grundlehner, supra.* This advantage

enjoyed by the owner of a nonconforming use over an applicant for a variance to create a new nonconforming use is not absolute, however, and the mere existence of a nonconforming use does not of itself give rise to special reasons entitling the owner to a variance for the enlargement of the use. The Board of Adjustment found:

"This Board is faced with the inescapable fact that the dairy is a non-conforming use and that its future maintenance cannot be proscribed. So long as the dairy is to be there it will best serve the public welfare if the premises are made as attractive as possible and the dairy permitted to use the premises with a maximum of efficiency and use of the property for dairy purposes."

The clear implication of this finding—when read with the finding, quoted above, that Dairies should be permitted to "expand within the limits of the area now owned by it"— is that the Board erroneously believed that the presence of the nonconforming use of itself supplied special reasons justifying an extension to the four corners of the property. The cases of *Grundlehner, supra,* and *Kramer, supra,* relied upon by Dairies, rather than supporting its position, point up the necessity of showing special reasons independent of the mere existence of the nonconforming use. In *Grundlehner* this Court permitted the grant of a variance for the alteration of a funeral home, a nonconforming use in a residential zone, which resulted in a minor extension merely squaring off the building. In that case the Court was satisfied by a showing that the alteration, because it would eliminate the carrying of caskets into the street and other congestion, would be "a minimization rather than an intensification of the discordant use." *Id.* at 270. To the contrary, in the present case the residence zone would not receive the benefit of a minimization of a discordant use but by the proposed major expansion would be subjected to an intensification of a use alien to the zone. In *Kramer* a variance was upheld which permitted the construction of a modern hotel to replace a deteriorating old hotel, a nonconforming use in a residential zone. The new hotel, unlike Dairies' proposed

expansion, was to be smaller in bulk than the structure it was to replace. Moreover, it was shown that the hotel site was unsuitable for the permitted single family use and was peculiarly suitable for the proposed use. *Id.* at 287–288 and 291. No such evidence appears in the present case.

We conclude that none of the reasons advanced for the grant of the variance, viewed singly or in their aggregate, are sufficient to support the action of the municipal bodies, and therefore the grant of the variance to Dairies must be set aside as arbitrary and unreasonable. In this Court Dairies for the first time argues that although the plaintiff challenged the grant of this variance before the Mayor and Council his failure to appear at the hearings before the Board of Adjustment deprives him of standing to bring this action. Under the facts of this case we find no merit in this contention.

In view of our disposition of the case it is unnecessary for us to consider whether the negative criteria of the statute have been met. Nevertheless, we find it difficult to believe that an expansion of the magnitude permitted by the variance would not "substantially impair the intent and purpose of the zone plan and zoning ordinance." It would seem that, regardless of the effect on property values, the doubling of this industrial operation could lead to no other result than to detract from the residential character of an area otherwise devoted to private homes. Compare *Cooper v. Maplewood Club,* 43 *N. J.* 495 (1964). This effect is particularly apparent in the proposed construction and operation of the 14 foot high loading dock which would extend 478 feet out into Dairies' property parallel to, and but a few feet from, the property lines of homes which Dairies' expert testified constituted "one of the nicest and highest type residential areas in Fair Lawn."

The judgment of the Appellate Division is reversed and the cause is remanded to the Law Division for entry of judgment in accordance with this opinion.

JACOBS, J., concurs in result.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For affirmance*—None.