**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4349-15T3

RICHARD BARNASKAS and TERRI
BARNASKAS, his wife,

    Plaintiffs-Appellants,

v.

ZONING BOARD OF ADJUSTMENT
OF THE TOWNSHIP OF JACKSON
and MIB PROPERTIES, LLC,

    Defendants-Respondents.

_____

> Argued February 15, 2018 — Decided August 2, 2018
>
> Before Judges Haas, Rothstadt and Gooden Brown.
>
> On appeal from Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-1637-15.
>
> Edward F. Liston, Jr., argued the cause for appellants.
>
> Sean D. Gertner argued the cause for respondent Zoning Board of Adjustment of the Township of Jackson (Gertner & Gertner, LLC, attorneys; Sean D. Gertner, on the brief).
>
> Robert C. Shea argued the cause for respondent MIB Properties, LLC (R.C. Shea & Associates,

PC, attorneys; Robert C. Shea and Dina M. Vicari, on the brief).

PER CURIAM

Plaintiffs Richard and Terri Barnaskas appeal from the May 6, 2016 Law Division order, dismissing their complaint with prejudice. In so doing, the trial court affirmed the decision of defendant Zoning Board of Adjustment of the Township of Jackson (Board), approving the application of defendant MIB Properties, LLC (MIB) for a use variance along with preliminary and final major site plan approval. We affirm.

To place the current appeal in context, a brief history of the property is necessary. The subject property is located along and to the east of Cooks Bridge Road in Jackson, New Jersey. The property was originally a single parcel identified as Block 14801, Lot 5, consisting of approximately seven acres located in a planned retirement community (PRC) zone and owned by U.S. Home Corporation. Lot 5 was eventually conveyed to Manhattan Real Estate (MRE), which, in 2008, applied for a "use variance with preliminary/final site plan approval to construct an office park, including office buildings, a nursery school[,] and [a] bank . . . ." In an amended application, MRE sought to

> proceed[] with its presentation on a bifurcated basis, seeking only a determination . . . as to its use variance to permit a bank . . . on approximately 1.2 acres . . . and

reserving issues relating to a full site plan for the entire tract for a later application, such issues to include the use of the remaining parcel for age-restricted development.

In Resolution 2008-36, adopted on August 6, 2008, the Board approved the application, subject to various conditions, including: 1) MRE agreeing to erect a bank on 1.2 acres of the site, "leaving the approximate six . . . remaining acres for subsequent development for an age-restricted residential development"; and 2) MRE agreeing that "it must receive preliminary and final site plan approval for the complete project . . . within one . . . year, at which time the use variance granted herein shall expire."

Subsequently, MRE sought "an amended preliminary and final site plan approval for the construction of a bank on the site, and preliminary approval for the construction of age-restricted condominiums." On January 21, 2009, in Resolution 2009-02, the Board approved MRE's application for the subdivision of Lot 5 subject to several conditions, including MRE "commenc[ing] construction of the condominiums within five years of the date of this resolution." The Resolution specified that "[f]ailure to do so [would] result in a nullification of any variances granted by this Resolution to enable [MRE], or its successors, to construct condominiums on the subject property." Thereafter, Lot 5 was

subdivided into Lots 5.01, where the proposed bank would sit, and Lot 5.02 where the age-restricted condominiums would be constructed.

After Resolution 2009-02 was issued, Lot 5.02 was sold to MIB. On December 23, 2014, MIB filed an application for a preliminary and final major site plan with "d" and "c" variance relief pursuant to N.J.S.A. 40:55D-70 to construct a funeral home with accessory uses, to include a residential apartment, banquet space and office space. Funeral homes were not a permitted use in the PRC zone. However, under N.J.S.A. 40:55D-70(c)(1), the Board had the power to grant a variance

> [w]here: (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation pursuant to [the Municipal Land Use Law (MLUL)] would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property . . . .

Under N.J.S.A. 40:55D-70(d)(1), "[i]n particular cases for special reasons," the Board had the power to grant a variance "to allow departure from regulations pursuant to [the MLUL] to permit

4

. . . a use or principal structure in a district restricted against such use or principal structure[.]"  However,

> No variance or other relief may be granted under the terms of this section, . . . without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

> [Ibid.]

On February 21, 2015, MIB provided notice of its application in the Asbury Park Press, including a description of the project and the requested variances as well as a list of documents and plans on file with the Board and available for public inspection. MIB also sent notices to all property owners within 200 feet of the subject property.  On March 4, 2015, the Board conducted its first public hearing on MIB's application, which was attended by the Board's professionals and during which members of the public opposed the application.  To support its application, MIB presented expert testimony from its project architect, engineer and planner, and traffic engineer, along with testimony from its owner, providing an overview of the project as well as the operation of the proposed development.

In essence, MIB sought to construct a funeral home that "incorporate[d] a whole variety of different uses under the roof of a funeral home."  MIB's owner, Geraldine Oliverie Hennicke, a

Funeral Director since 1987, testified that her vision of the funeral home was "cutting edge of what [was] happening in the states around us where they [are] encompassing everything under one roof to satisfy the needs of the families and clients from pre-arrangements to . . . repass."

The Board's professional planner added that MIB's funeral home was the principal use with "a number of customarily incidental accessory uses inside the building." John Amelchenko, MIB's architect, agreed that the funeral home was "designed to really function as a self-contained facility" with accessory uses for the "convenience [of] the friends and family of the deceased." He testified about the novelty of the concept, stating "[i]t [was] not your father's funeral home" but "a trend in funeral home design that is . . . happening all over . . . the country." Amelchenko explained that the approximately 19,000 square foot building was designed with complex roof lines, to "soften[] . . . the overall size of the building[,]" along with "white trim, white columns, cupolas, copper roofs[,]" and "stone veneers," in an attempt to provide a "residential quality[.]"

According to Amelchenko, the 14,000 square foot first floor of the building would have three viewing rooms, capable of holding eighty people each with a sitting area to provide a "residential feel[]" complete with a fireplace, bookcases, and a television.

A-4349-15T3

There would also be two conference rooms used to meet with family members of the deceased to make selections on caskets or urns. According to Amelchenko, the other functional aspects of the funeral home where the deceased would be received and prepared for viewing were completely separated from the public portions of the building to avoid contact with visitors.

Amelchenko explained that one of the accessory uses that the funeral home would contain was a one-hundred-and-sixty-seat banquet hall with a "warming kitchen" to hold post-funeral repasses. According to Amelchenko, the banquet hall would not be open to the general public, as if it were a restaurant, and, instead, would be used "strictly for [the] repass[es.]" He described the kitchen as designed to serve pre-prepared food, rather than food prepared on site, "that passes through the kitchen, gets prepped, and then is brought out into the banquet facility." After the service, the family would access the banquet hall for the catered meal through an atrium space.

In addressing health and safety concerns with having food served in a funeral home, Hennicke explained that the building was designed with an atrium in the middle and sets of doors separating the banquet area to ensure that "food [would] never come in through the funeral home." Amelchenko confirmed that the atrium space separated the funeral home from the banquet facility and served

as a sitting area with "a water feature" and "a large skylight that will provide some natural light . . . ." Additionally, according to Amelchenko, there would be a small retail area where guests might be able to purchase some flowers, prayer cards, or other "things of that nature."

Another accessory use identified for the funeral home by Hennicke was a two-bedroom apartment for staff members "to be on the premises [twenty-four] hours a day to answer the families' needs[,]" as people can pass away at any hour of the day or night. Noting that the funeral home's hours of operation would be from 8:00 a.m. to 10:00 p.m., Hennicke proposed that the apartment would be occupied by her daughter and her daughter's fiancé, who were both part of the business, as it was a "family owned and operated" business.

MIB's application also included a nine-hundred square foot office space on the second floor for "the purpose of having a combination where an attorney and a financial advisor [would] work with . . . [Hennicke] for Medicare spend downs" and purchasing funeral services and crypts upfront. Acknowledging that she was unable to provide the expert advice that a financial planner and estate planning attorney could, Hennicke explained that MIB was trying "to help families understand the laws and how to protect their assets and what they can do and cannot do within the law."

In addition, it was confirmed that "[t]his [was] not a situation where the attorney [would] do personal injury or workers' compensation, this [would] be affiliated with the funeral and the funeral operation" to continue "the concept of one service under one roof."

Supporting variance relief from the PRC zoning requirements, MIB's project engineer and planner, Brian Murphy, delineated the site plan and surrounding properties, including the Winding Ways Retirement Community, and detailed the requested waivers and C1 and C2 variances connected with the PRC zone, including the needed increased building height for the garage to accommodate the storage of hearses. He agreed that the funeral home was the principal use and that "[n]one of these other uses exist without it."

Murphy testified that the previously approved condominium units envisioned a very "long building[,]" whereas the MIB proposal had a "very residential look" and was an "attractive building." He also found the funeral home to be particularly well suited for the site and an appropriate use given the location of the property and the other commercial uses in the area, particularly, the bank. According to Murphy, it was "a good transition between [the] residential use to the south and the bank [and municipal building] which [were] to the . . . north and west."

Murphy explained further that the use was appropriate for the relatively small "size of the property only being [six] acres where[as] 100 acres [were] required in a [PRC] zone." Furthermore, he testified that the MIB proposal was a "less intense use on the site" than the condominium units, because the condominium units would involve vehicular access during peak hours, "unlike the funeral home, which is off peak hours pretty much for the entire use of the building."

Murphy testified that the project satisfied the statutory requirements of N.J.S.A. 40:55D-2 in that the project provided adequate light, air, and open space, while exceeding the 25% of open space requirement. He explained that the way the building was situated, "it [was] not a wall of building, rather . . . it [was] nicely laid out with the atrium and all the windows, . . . providing plenty of light into the facility." Additionally, Murphy indicated the project provided sufficient space in the appropriate locations for a variety of commercial and residential uses. Further, he testified that the project "provide[d] a desirable and visual development" with "a very attractive building for the Township."

Murphy also addressed the negative criteria under N.J.S.A. 40:55D-70d(1), and determined that the funeral home would be an improvement to the community. He invoked the Township's master

10

plan, specifying that "[a] key goal [was] to work towards a balanced community." Murphy indicated that "while the housing stock [was] now more than balanced[,] . . . commercial and industrial development need[ed] to be expanded to meet local needs." To that end, he found that "this project in particular exactly exemplifie[d] that goal." He testified that although there had been approval for housing stock on the property, he did not "believe it [was] all that viable[,]" as demonstrated by the lack of development "in the last five, six years."

Murphy also stated that "[a] retirement community really [was not] appropriate on such a small lot," and given that there was "a lighted intersection and it would be sharing driveways with another commercial use," he believed "the commercial use [was] more conducive to this property." Murphy opined that the "benefits of this project certainly outweigh[ed] any negatives" because it supported the goals of the master plan, and he saw no negative impact with the use, especially given the decrease in "traffic impact than a permitted use would [be] on the property."

John Rea, MIB's traffic engineer, testified that the impact of the funeral home "on peak hour traffic at the intersection of Cooks Bridge Road and Manhattan Street" would "be less than what was previously studied [for the 2008 application], and . . . the intersection would operate acceptably." Rea opined that "the use

variance [could] be granted . . . without having an adverse or detrimental impact on traffic conditions." The Board's traffic engineer reviewed Rea's reports and testimony and agreed with his conclusions, indicating that he was "satisfied . . . [MIB could] address the safety concerns as they have been laid out."

The Board scheduled an additional hearing date for April 1, 2015, in order to give more members of the public a chance to speak, and the Board more time to consider the application. Several members of the public, including plaintiff Terri Barnaskas, testified at the hearing, opposing the application and raising concerns about the adverse impact on traffic and home values, garnering the necessary licensing from the applicable licensing agencies, and housing as a preferred use of the site.

Following the hearings, by a majority vote, the Board approved MIB's application for variances and design waivers along with preliminary and final major site plan approval. On May 6, 2015, the Board adopted Resolution 2015-21, memorializing its approval for MIB to construct a "two-story structure for use as a funeral home that will contain a total of 19,771 square feet which would include related offices, rental offices, a banquet facility, an apartment, paved parking lot with . . . 172 parking spaces, a trash enclosure area and a detached garage."

In the Resolution, the Board reviewed the history of the site as well as the testimony and exhibits entered into the record. The Board also addressed the positive and negative criteria for the project, noting that "the parcel was substantially undersized for the use for which it [was] zoned." Through its review, the Board determined that MIB "established special reasons for the grant of a variance pursuant to N.J.S.A. 40:55D-70(d)(1) in that the site . . . [was] appropriate" for the proposed use "notwithstanding the deviations from one or more of the conditions imposed by the Land Use and Development Regulations of the Township." Further, the Board determined that MIB "established that development of the proposed use [would] not cause such damage to the character of the surrounding neighborhood so as to constitute substantial detriment to the public good nor . . . substantially impair the intent and purpose of the zone plan and zoning ordinance."

As to the negative criteria, the Board indicated that the proposed construction had "an aesthetically pleasing design," and MIB agreed "to obtain required approvals to address both better signage and timing of the existing traffic signal," "to maintain the existing open space requirement of a related parcel from a previous approval," and to "improve[e] interior circulation . . . as suggested by Board professionals." The Board imposed various

conditions, however, including requiring MIB to obtain "approval of all other outside agencies exercising jurisdiction in this matter," and to "contact the Board of Mortuary Science and any other State or County Agency having jurisdiction over the approved use with ancillary uses . . . in order to assure that the regulatory oversight agencies approve the design and use concept approved" by the Board.

On June 10, 2015, plaintiffs filed a complaint in lieu of prerogative writs, contending that the Board's decision was arbitrary, capricious and unreasonable, and seeking to overturn the Board's decision as against the weight of the evidence and the law. On April 8, 2016, Judge Robert E. Brenner conducted a bench trial on the record, and issued an oral opinion on April 27, 2016, affirming the Board and dismissing plaintiffs' complaint with prejudice. In rendering his decision, Judge Brenner addressed all of the contentions in plaintiffs' complaint.

First, the judge rejected plaintiffs' contention that MIB was bound by the condition to build age-restricted condominiums imposed on former Lot 5 in the 2008 and 2009 Resolutions. Judge Brenner reviewed Resolutions 2008-36 and 2009-02, in conjunction with the history of former Lot 5 and the subsequent subdivision, and concluded that the prior resolutions did not preclude the Board from approving MIB's application. According to the judge,

> Lots 5.01 and . . . 5.02 are independent of each other as a result of the previous subdivision. The lots were developed at different time periods and did not have common zoning or construction permits. They're currently owned by different entities. The bank is constructed and has been operating for many years. . . . Resolutions 2008-36 and 2009-02 do not permanently bind Lots 5.01 and 5.02 together and do not preclude the Board from approving what I see as a new application by MIB.

To support his conclusion, the judge explained that Resolution 2009-02 indicated that MRE "requested two separate reliefs in its applications because Lots 5.01 and 5.02 would ultimately be subdivided and potentially owned by two different owners." Accordingly, "the approvals on Lots 5.01 and 5.02 were not contingent on each other because if they were[,] MRE would have sought preliminary and final site plan approval for both lots simultaneously." Moreover, Resolution 2009-02 provided an explicit five-year limitation on the construction of the condominium units and, according to Judge Brenner, "the failure to do so resulted in a nullification of any variances granted by the Resolution."

Next, Judge Brenner rejected plaintiffs' contention "that the Board's approval of the accessory uses to the funeral home [were] a nullity because MIB neither sought nor received variance relief for what plaintiff[s] argue[] [were] separate principal uses."

15                                                                    A-4349-15T3

Judge Brenner explained that the banquet facility was "totally associated with the funeral home and not to be used for outside purposes but to be used only for [repasses]"; the two-bedroom apartment was "to be occupied by the funeral home manager who assist[ed] with the operation of the business or other employees of the funeral home"; and the rental office space was to be used "for the purposes of having an attorney and financial planner to work with [Hennicke] for Medicare spend-downs and service as such." Relying on State v. P. T. & L. Construction Company, 77 N.J. 20 (1978), the judge determined that "while the concept of providing one location for all . . . funeral needs is something new and trending, the law makes clear that that does not prevent this [c]ourt from rendering its decision that these are accessory uses to the principal . . . or primary use."[1]

Turning to plaintiffs' assertion "that the public did not receive sufficient notice . . . that the rental offices were separate principal uses[,] and . . . that MIB was seeking relief from the conditions . . . allege[dly] contained in the 2008 Resolution[,]" Judge Brenner explained that plaintiffs did not raise any notice deficiencies in their complaint and thus "the

---

[1] Judge Brenner also rejected plaintiffs' contention that MIB proposed a coffee-snack bar, finding that "[i]t was not part of the record [and] . . . that the only food that will be on the premises is in regard to the banquet facility."

argument [was] not properly before the [c]ourt." Nonetheless, the judge determined "that MIB's public notice complie[d] with N.J.S.A. 40:55D-11." The judge elaborated that MIB's notice timely and adequately conveyed the "date, time, and place of the hearing, the nature of the matters to be considered, and an identification of the property proposed for the development." The judge continued that the notice "depict[ed] in detail the specific types of variances sought," and "provided a specific list of items that were on file with the Board and available for inspection." The judge concluded that "[t]he public was not deprived of any pertinent information."

Judge Brenner also rejected plaintiffs' contention "that the Board lacked jurisdiction to reopen the hearing" on April 1, 2015. The judge noted that when the March 4, 2015 hearing was opened for public comment, the weather created a driving hazard "and many members of the public who attended the meeting left early." As a result, one of the Board members requested a continuance, stating that there was "an awful lot of testimony" and "information to be absorb[ed] in three hours." The Board member explained that he did not "feel like [he was] ready to vote on this one way or the other without thinking about what [he] heard[,]" and sought the continuance to consider the proposal and also to permit members of the public who had already left a chance to comment. Judge

Brenner deferred to the Board's "broad discretion" and determined that the circumstances constituted a proper justification to reopen the hearing for an additional day, and that the Board acted reasonably.

Finally, Judge Brenner rejected plaintiffs' contention that "the variances should not have been granted on the record before the Board." Instead, citing Kohl v. Fair Lawn, 50 N.J. 268 (1967) and Burbridge v. Mine Hill, 117 N.J. 376 (1990), the judge found that "MIB satisfied the positive criteria to support the Board's granting of the use variance . . . ; that MIB satisfied the negative criteria . . . ; and that the Board's determination to grant the use variances [was] neither arbitrary nor capricious." To support his decision, the judge detailed the expert testimony presented by MIB, some of which was supported by the Board's professionals, and concluded that MIB produced uncontroverted expert testimony to support its application. The judge also recounted the history of Lot 5, which included a 2002 settlement agreement requiring the approval of the Winding Ways Retirement Community Homeowners Association, which MIB had obtained. Thus, the judge affirmed the decision of the Board and dismissed plaintiffs' complaint with prejudice. This appeal followed.

On appeal, plaintiffs renew the arguments rejected by Judge Brenner as follows:

18                                                          A-4349-15T3

I. MIB NEVER SOUGHT, AND THE BOARD NEVER GRANTED, RELIEF FROM THE CONDITIONS AGAINST FURTHER COMMERCIAL DEVELOPMENT WHICH WERE IMPOSED ON FORMER LOT 5 AS PART OF THE BANK APPROVAL ON CURRENT LOT 5.01; ANY VARIANCE RELIEF FOR COMMERCIAL DEVELOPMENT ON CURRENT LOT 5.02 IS A NULLITY.

II. NEITHER THE PRACTICE OF LAW, NOR FINANCIAL PLANNING, NOR POST-FUNERAL BANQUET HALL RENTALS, NOR A COFFEE/SNACK BAR STORE, NOR THE TWO-BEDROOM APARTMENT, CAN BE ACCESSORY TO A FUNERAL HOME; SINCE MIB NEITHER SOUGHT NOR RECEIVED VARIANCE RELIEF FOR THESE SEPARATE PRINCIPAL USES, THE APPROVAL IS A NULLITY.

III. THE PUBLIC DID NOT RECEIVE SUFFICIENT NOTICE THAT THE 'RENTAL OFFICES' WERE SEPARATE PRINCIPAL USES, AND THE PUBLIC DID NOT RECEIVE ANY NOTICE WHATSOEVER THAT RELIEF FROM THE 2008 CONDITIONS OF APPROVAL WERE SOUGHT; THE BOARD'S DECISION IS NULL AND VOID FOR LACK OF JURISDICTION.

IV. THE BOARD OF ADJUSTMENT'S INABILITY TO DECIDE ON THE APPLICATION AFTER THE PROOFS WERE CLOSED SHOULD HAVE RESULTED IN A DENIAL OF THE APPLICATION; THE BOARD LACKED JURISDCTION TO REOPEN THE PROOFS.

V. THE BOARD DID NOT HAVE SUFFICIENT RECORD SUPPORT TO GRANT MIB'S APPLICATION; THE TRIAL COURT ACCEPTED THE BOARD'S ERRONEOUS LEGAL REASONING AND UNTENABLE FACTUAL FINDINGS.

We review a zoning board's decision using the same standard as the trial court, Cohen v. Bd. of Adjustment of the Borough of Rumson, 396 N.J. Super. 608, 614-15 (App. Div. 2007), and, like the trial court, our review is limited. Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 327

(1998). We give deference to a zoning board's decision and will only reverse if the decision was arbitrary, capricious, or unreasonable. <u>Kane Properties, LLC v. City of Hoboken</u>, 214 N.J. 199, 229 (2013). However, where the issue on appeal involves a purely legal question, we afford no special deference to the trial court's or the zoning board's decision, and must determine if the board understood and applied the law correctly. <u>D. Lobi Enters., Inc. v. Planning/Zoning Bd. of the Borough of Sea Bright</u>, 408 N.J. Super. 345, 351-52 (App. Div. 2009).

In affording deference to the zoning board, a reviewing court may not substitute its judgment for that of the municipal body. <u>Kramer v. Bd. of Adjustment</u>, 45 N.J. 268, 296-97 (1965). As Justice Long emphasized in <u>Jock v. Zoning Bd. of Adjustment</u>:

> In the final analysis . . . public bodies, because of their peculiar knowledge of local conditions, must be allowed wide latitude in their delegated discretion. The proper scope of judicial review is not to suggest a decision that may be better than the one made by the board, but to determine whether the board could reasonably have reached its decision on the record.
>
> [184 N.J. 562, 597 (2004) (citations omitted).]

Consistent with this jurisprudential policy of deference to a local board's peculiar knowledge of local conditions, "[a] court should sustain a local zoning board's determination to grant a

zoning variance if that board's decision comports with the statutory criteria and is founded on adequate evidence [in the record.]"  Burbridge, 117 N.J. at 385.  Applying the above standards, we discern no reason to disturb the trial court's or the Board's decision and affirm substantially for the reasons expressed in Judge Brenner's cogent oral opinion.  We add the following comments.

We recognize that "[z]oning variances are often made subject to conditions, contravention of which constitute violations of land use ordinances."  Washington Commons, LLC v. City of Jersey City, 416 N.J. Super. 555, 560 (App. Div. 2010).  The conditions, like the variances themselves, run with the land and are binding on subsequent owners.  Aldrich v. Schwartz, 258 N.J. Super 300, 308 (App. Div. 1992).

Here, however, Resolution 2009-02 contained explicit nullifying language, specifically, that any variances granted in connection with the age-restricted condominiums would expire if they were not constructed within five years.  As such, the failure to commence construction of the condominiums within the required five years of the resolution nullified the variances.  In addition, we agree with Judge Brenner that Resolution 2009-02 clearly showed that MRE requested two separate forms of relief.  Thus, we reject plaintiffs' contention that the Board's "failure to require [MIB]

21

to apply for variance/changed-circumstances relief" from the conditions imposed in the resolutions "deprived it of jurisdiction."

Likewise, we reject plaintiffs' assertion that each of the uses the Board and Judge Brenner deemed accessory to the principal use were, in fact, principal uses that each required separate requests for variance relief. Jackson Township Code Sec. 244-6 defines "Principal Use" as "[a] use of land, building or structure, or portion thereof, allowed in a zoning district and subject to the restrictions applicable to that district." An "Accessory Use" is defined as "[a] use of land, or of a building or portion of a building or of a structure . . . customarily incidental and subordinate to the principal use . . . located on the same lot with such principal use." Ibid.

Although "[z]oning ordinances frequently permit uses that are accessory or incidental to an expressly permitted use[,] . . . they often do not define those permitted accessory uses, and courts must determine whether the proposed accessory use is 'customarily incidental' to the main activity." Wyzykowski v. Rizas, 132 N.J. 509, 518 (1993). "[A]n accessory use is implied as a matter of law as a right which accompanies the principal use." Shim v. Washington Twp. Planning Bd., 298 N.J. Super. 395, 401 (App. Div. 1997). "Zoning ordinances which permit 'customarily incidental'

accessory uses to the main activity permit, by implication, any use that logic and reason dictate are necessary or expected in conjunction with the principal use of the property." Charlie Brown of Chatham, Inc. v. Board of Adjustment, 202 N.J. Super. 312, 323 (App. Div. 1985)).

"In analyzing whether a use is customarily incident to the permitted use, two determinations must be made. The first is whether the use is incidental to the main use: does the use bear a close resemblance and obvious relation to the main use to which the premises are put?" P. T. & L., 77 N.J. at 26-27 (alteration omitted). "Second, it must be determined whether a use which is found to be incident to the permitted use is also a customary use." Id. at 27. "Generally, a use which is so necessary or commonly to be expected that it cannot be supposed that the ordinance was intended to prevent it will be found to be a customary use." Ibid. "The fact that a use is not customarily indulged in, however, is not conclusive, and even if the use in question is found in a small percentage of similar main uses, the use may still be found to be 'customary.'" Ibid.

Here, the funeral home is clearly the principal use and the other proposed uses are "incidental and subordinate" to the funeral home. The attorney's and financial planner's offices are to be used only for the benefit of the funeral home's customers. They

are not permitted to work on outside matters or have clients who are not also clients of the funeral home.[2] Likewise, the banquet hall is not a restaurant and is not open to the general public for dining. Indeed, its only purpose is to provide a banquet facility for catered dining following a funeral.[3]

Similarly, the two-bedroom apartment to be used by MIB's employees is incidental to the funeral home. In that regard, Charlie Brown is distinguishable. There, we affirmed the Board's denial of a variance for Charlie Brown's construction of second floor apartments to provide sleeping accommodations for the restaurant's personnel as part of the company's compensation program. 202 N.J. Super. at 318-19. The Board denied the application, which violated the zoning laws' prohibition against residential uses mixed with commercial uses, finding that the use did not constitute an accessory use. Id. at 318.

We affirmed because there was no proof presented that providing employees with sleeping quarters on the premises of a restaurant was reasonably related or incidental to its operation. Id. at 324. In so doing, we viewed the term "incidental" in the

---

[2] We leave to these two professionals the task of determining whether this arrangement raises ethical concerns with their respective licensing entities.

[3] Like Judge Brenner, we reject plaintiffs' continued reference to a snack bar as it is not part of the record.

definition of "accessory use" to incorporate two concepts; the use must be "subordinate and minor in significance" and must also bear a "reasonable relationship with the primary use." Ibid. "It is not enough that the use be subordinate; it must also be attendant or concomitant." Ibid.

Here, MIB presented sufficient evidence that their employees residing on site was directly related, subordinate and attendant to the main permitted use of the property's operation as a funeral home, as opposed to a part of MIB's compensation program. As Hennicke pointed out, people do not die between normal business hours and employees living on site would be able and available to answer calls and assist families at any hour of the day or night.

Similarly, we reject plaintiffs' contention that the public did not receive sufficient notice that the "rental offices . . . were separate businesses," and "that the effect of MIB's application was to seek relief from the conditions of Resolutions 2008-36 and 2009-2." Although this issue was not properly before the trial court and, in turn, not properly before us, our decision that the rental offices were permissible accessory uses and that MIB was not required to seek relief from the conditions contained in the prior resolutions render these contentions moot.

Equally unavailing is plaintiffs' assertion that "[i]t was improper for the Board . . . , upon realizing that . . . MIB had

25                                                        A-4349-15T3

not met its burden of proof, to reopen the record and permit supplementation of the record to correct perceived deficiencies in the application." Despite plaintiffs' baseless assertions to the contrary, we find no reason to believe the matter was reopened for any improper reason.

Finally, we reject plaintiffs' argument that MIB failed to satisfy both the positive and negative criteria required to warrant variance relief. Undoubtedly, an applicant seeking a use variance has the burden to "prove both positive and negative criteria" to a zoning board. Smart, 152 N.J. at 323. The positive criteria set forth in N.J.S.A. 40:55D-70(d)(1) authorizes a zoning board, "[i]n particular cases for special reasons, [to] grant a variance to allow departure from regulations pursuant to . . . [the MLUL] to permit . . . a use or principal structure in a district restricted against such use or principal structure . . . ."

The term "special reasons" is not defined in N.J.S.A. 40:55D-70(d)(1). However, special reasons may be found where: (1) the proposed use inherently serves a public good; (2) the owner of the property would suffer an "undue hardship" if required to use the property in the manner permitted by the zoning ordinance; or (3) the use would serve the general welfare because the site is particularly suitable for the proposed use. Nuckel v. Little Ferry Planning Bd., 208 N.J. 95, 102 (2011).

In general, particularly suitable means that "the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought." Kohl, 50 N.J. at 279. Our Supreme Court has observed that, in the context of the specific parcel, it means that strict adherence to the established zoning requirements would be less beneficial to the general welfare. See Kramer, 45 N.J. at 290-91. An application demonstrates a special reason if there is proof that "the subject property was particularly suitable for the proposed use." Medici v. BPR Co., 107 N.J. 1, 24 (1987).

At the same time, our Supreme Court has recognized that almost all lawful uses of property can be said to promote the general welfare to some degree, with the result that if general societal benefit alone constituted "an adequate special reason, a special reason almost always would exist for a use variance." Kohl, 50 N.J. at 280. As a result, any application for a use variance based on the particularly suitable standard has always called for an analysis that is inherently site-specific. See Stop & Shop Supermarket Co. v. Bd. of Adjustment of Springfield, 162 N.J. 418, 431 (2000).

The negative criteria set forth in N.J.S.A. 40:55D-70 states that the applicant must show the "variance or other relief can be granted without substantial detriment to the public good and will

not substantially impair the intent and the purpose of the zone plan and zoning ordinance." The applicant must establish the negative criteria with an "enhanced quality of proof." Price v. Himeji, LLC, 214 N.J. 263, 286 (2013). To do so, the applicant must focus "on the effect that granting the variance would have on the surrounding properties." Ibid. The applicant "must reconcile the grant of the variance for the specific project at the designated site with the municipality's contrary determination about the permitted uses as expressed through its zoning ordinance." Ibid.

We conclude there was sufficient credible evidence supporting the Board's finding that MIB satisfied both the positive and negative criteria for the use variance. As to the positive criteria, the Board had ample evidence that the approximately six acres comprising Lot 5.02 was particularly suited for the funeral home and substantially undersized to construct condominium units. The funeral home would continue the residential feel of the surrounding area while providing a buffer between the commercial and residential uses. MIB met all applicable light, air, and open space requirements, while also addressing the decreased traffic impact.

As to the negative criteria, as Judge Brenner found, although residential development on the property had been approved, the

fact that it had been undeveloped for almost six years indicated that residential use was not the most viable option. Additionally, both the Board's traffic engineer and MIB's traffic engineer agreed that the traffic impact would be less than if condominium units were constructed. Further, as Judge Brenner found, a funeral home with a residential look and aesthetically pleasing design would provide a balanced community, which was directly in line with Jackson Township's master plan. Therefore, we are satisfied that the Board's decision was not arbitrary, capricious, or unreasonable and was amply supported by the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4349-15T3